**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(KANSAS CITY DOCKET)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17-20079-CM-JPO |
| ) | |
| TROY A. GREGORY, ) | |
| ) | |
| Defendant. ) | |

**MOTION TO DISMISS INDICTMENT OR, IN THE ALTERNATIVE,
EXCLUDE POST-INDICTMENT GRAND JURY EVIDENCE
AND MEMORANDUM IN SUPPORT**

Troy Gregory moves, under Fed. R. Crim. P. 6(b)(2), for an Order dismissing the Indictment (Doc. 1). Alternatively, Mr. Gregory respectfully requests that the Court exclude from trial certain grand jury evidence and testimony collected by the government after the Indictment issued on December 1, 2017. The reason for this request is simple: After returning the Indictment, the government continued to use the same grand jury to gather evidence in an attempt to bolster the seven pending charges asserted against Mr. Gregory. Doing so, it has abused the grand jury process and materially prejudiced Mr. Gregory's defense. Thus, for reasons set out below, federal law requires dismissal of the Indictment or, at minimum, exclusion from trial of post-Indictment evidence obtained via the grand jury.

**BACKGROUND**

**I.      The Indictment.**

Mr. Gregory served as a loan officer at University National Bank ("UNB") in Lawrence, Kansas from May 1992 until UNB placed him on administrative leave on July 1, 2009. He resigned from the bank on July 10, 2009. On December 1, 2017, the grand jury returned the

Indictment. Doc. 1. It advances charges only against Mr. Gregory, all of which, the government alleges, stem from an April 2008 loan to construct an apartment complex in Junction City, Kansas (the "Bluejay Loan"), from UNB to Bluejay Properties, L.L.C. ("Bluejay"). *See* Doc. 1 at ¶¶ 16-19.

The Indictment includes seven counts. Count 1 contends that Mr. Gregory "along with [John Wyatt] Duncan and with others" conspired to defraud one or more financial institutions. Doc 1 at ¶ 38. Counts 2 through 5 allege a scheme . . . to defraud a financial institution." Doc. 1 at ¶ 42. And Counts 6 and 7 allege that Mr. Gregory made false entries in UNB records "with the intent to defraud . . . ." Doc. 1 at ¶ 49. In addition to John Duncan, the Indictment identifies four other Bluejay members as "Borrower 1" through "Borrower 4." It also alleges participation by aiders and abettors and co-conspirators and harm to four "Victim Banks." *See* Doc. 1 at ¶¶ 4-8. The Indictment never refers to those members, aiders and abettors, co-conspirators, or "Victim Banks" by name.[1] But its specific, detailed allegations demonstrate that the government knows the identity and the alleged role played by each of those persons or entities.

**II.     The Post-Indictment Testimony of Grant Ryan.**

On December 1, 2017, the day the Indictment issued, the government served Grant Ryan, UNB's former Executive Vice President and Chief Lending Officer, with a subpoena dated November 9, 2017 (the "Ryan Subpoena"). Exhibit E. The Ryan Subpoena ordered Mr. Ryan to appear and testify before the grand jury on December 20, 2017 (*i.e.*, 19 days after the Indictment issued). *See* Ex. E.

On December 7, 2017, Mr. Gregory made his first appearance, was arraigned, and pleaded not guilty to the charges in the Indictment. Doc. 8 at 1. Mr. Ryan appeared before the

---

[1]     In Count I, however, the government alleges that John Duncan (among others) is a co-conspirator. Doc. 1 at ¶ 38.

grand jury on December 20, 2017.  *See* Ex. F.  There, the government focused almost exclusively on Mr. Gregory and the pending charges advanced against him.  Indeed, a review of the 113-page transcript of Mr. Ryan's grand jury testimony reveals that, after addressing introductory matters for approximately eight pages, the government spent nearly 88 of the remaining transcript pages (or about 83 percent of its substantive examination) questioning Mr. Ryan about Mr. Gregory and matters already set out in the Indictment.  The Indictment provided the substance and outline for the government's grand jury questions of Mr. Ryan.  It also is clear that the government used the factfinding function of the grand jury improperly to strengthen its case against Mr. Gregory.

The following table illustrates the extent that the government's examination of Mr. Ryan aligns with the allegations advanced in the pending Indictment:

| **Grand Jury Transcript (Ex. F)** | **Subject of Post-Indictment Grand Jury Testimony** | **Corresponding Indictment Paragraphs** |
|---|---|---|
| Tr. 9:10-11:18 | Salary and bonuses Mr. Gregory received from UNB, including government questioning about work Mr. Gregory performed for Bluejay members. | 1, 15, 24, 38-45 |
| Tr. 13:3-15:17 | UNB's internal loan policies and the alleged need to ratify many of Mr. Gregory's loans for failure to follow those policies. | 15, 17-21, 23-25, 30-31, 36-49 |
| Tr. 15:18-17:19 | Mr. Gregory's control over UNB's loan committee and its approval of his loans. | 15, 17-18, 20-21, 23-25, 36-49 |
| Tr. 17:20-21:10 | Cross-collateralization of loans, including government questioning about two CDs pledged as collateral for the Bluejay Loan. | 14-15, 17-19, 21, 23, 25, 30-31, 34, 36-49 |
| Tr, 21:11-23:6 | Mr. Ryan's concerns about the quality of UNB's loan write-ups and deviation from its loan policies. | 15-21, 23-25, 30-31, 36-49 |
| Tr. 23:7-29:9 | The Bluejay Loan, including Mr. Gregory's presentation and approval of the loan, his handling of the loan, and his representation that Bluejay member were financially strong. | 14-21, 23-25, 30-49 |

3

| Tr. 29:10-38:19 | Lumber pledged by John Duncan and Schmidt Builders Supply as collateral for the Bluejay Loan and Mr. Gregory and Mr. Ryan's inspection of that lumber. | 7, 14-15, 17-18, 21, 25, 28, 32, 34, 38-44 |
|---|---|---|
| Tr. 39:6-42:9 | Nominee loans generally and a $500,000 loan issued by Mr. Gregory to John Larkin, which was later distributed to John Duncan. | 15, 25, 27, 31, 38-45 |
| Tr. 42:10-45:12 | Mr. Gregory's alleged removal of documents during the OCC's 2008 examination of UNB's loan files. | 15, 18, 25, 38-45 |
| Tr. 48:17-55:16 | Mr. Gregory's resignation from UNB and government questioning about UNB's charge-offs of Mr. Gregory's loans, including those issued to Bluejay members, Big D, and Dave Freeman. | 15, 17-19, 24-26, 38-45 |
| Tr. 55:17-74:24 | Representations and alleged omissions by Mr. Gregory about Bluejay members' financial strength and the CDs and land pledged as collateral for the Bluejay Loan. | 15-21, 23-25, 30-49 |
| Tr. 82:6-83:10 | Mr. Ryan's concern about fraud and misrepresentation at UNB and his refusal to allege that anyone "absolutely committed fraud." | 15-21, 23, 25, 30-45 |
| Tr. 83:11-86:14 | Potential harm resulting from the use of Bluejay Loan proceeds to fund, in part, the CDs securing the Loan. | 15, 17-19, 21, 23, 25, 30-31, 33-34, 36-49 |
| Tr. 86:15-88:13 | Misrepresentations or a lack of transparency in UNB loans, including misrepresentations by John Duncan, Dave Freeman, and other Bluejay members. | 15-19, 21, 24, 32-49 |
| Tr. 88:14-90:17 | Questions concerning whether Mr. Gregory had devised a scheme to conceal a lack of capital, as Kaw Valley Bank had alleged in a separate civil action, and potential nondisclosure or "non-transparency" while Mr. Gregory issued and serviced the Bluejay Loan. | 15-19, 21, 24-25, 30-49 |
| Tr. 91:17-93:2 | Whether UNB or Todd Sutherland had considered suing Mr. Gregory or any other borrowers to recover capital UNB had lost. | 1, 15, 38-49 |
| Tr. 101:8-102:1 | The date on which Mr. Ryan began to examine UNB loans. | 15, 39, 43 |
| Tr. 102:2-105:12 | Mr. Ryan's personal definition of fraud, his opinion about when, as a banker, he had a duty to report it, and Mr. Ryan's reports to the Board and federal regulatory agencies. | 15, 17-19, 23, 25-28, 31-35, 38-45 |
| Tr. 105:24-108:1 | Whether Mr. Ryan or UNB had ever considered calling back bonus payments that Mr. Gregory had received before he resigned from UNB. | 1, 15, 39, 43, |

| | | |
|---|---|---|
| Tr. 108:2-110:18 | Questions about why it was unhelpful to have Mr. Gregory involved in the UNB loan work-outs that Mr. Ryan preformed. | 15, 17-18, 25, 39-49 |
| Tr. 110:19-113:3 | Mr. Ryan's belief that Mr. Gregory was able to conceal his conduct from UNB and Mr. Sutherland while the economy remained healthy and loans remained current. | 15, 17-18, 20, 25, 36-49 |

Moreover, Mr. Ryan's testimony makes clear that he had reviewed the Indictment before appearing in front of the grand jury. Indeed, he expressly referred to it on multiple occasions to draw conclusions about Mr. Gregory and the Bluejay Loan. *See, e.g.*, Ex. F at 56; *Id*. at 70 (stating that "if the write-up would have been presented in the way the Indictment reads," he would not have voted to approve the Bluejay Loan); *Id*. at 112 (testifying that the "two-page write-up for Quinton Properties is drastically different than the Indictment.").

**III.   The UNB Subpoena and Post-Indictment Document Production.**

Before the grand jury returned the Indictment, it issued a subpoena to UNB dated November 9, 2017 (the "UNB Subpoena"), requesting that the bank produce documents on or before December 20, 2017 (*i.e.*, 19 days after the Indictment). Exhibit A. Clearly, the documents sought by the subpoena were never intended to be presented to the grand jury. Rather, the subpoena was intended to improve the government's evidence for trial and as a substitute for discovery. After Mr. Gregory's initial appearance and arraignment on December 7, 2017 (*i.e.*, six days after the Indictment issued), Department of Justice Attorney Andrew Tyler confirmed that the pre-Indictment UNB Subpoena remained outstanding. *See* Exhibit B at 1. Mr. Tyler also confirmed that the same grand jury that had indicted Mr. Gregory had issued the pending UNB Subpoena. Ex. B at 1.

Later, on January 2, 2018 (*i.e.*, 32 days after the Indictment issued), Mr. Tyler notified counsel for Mr. Gregory by email that the government had "*just received a new production* that

5

appears to contain tens of thousands of pages of documents." Ex. B at 3-4 (emphasis added). Mr. Tyler informed Mr. Gregory's counsel that the government was "working to get [that production] processed and turned around to you quickly." Ex. B at 4.

On January 23, 2018, the government produced 59,916 pages of documents to Mr. Gregory's counsel. In a cover letter, the government noted that it had "not reviewed these documents, but it is [the government's] understanding that this production contains emails and email attachments that were provided by The University National Bank." Exhibit C. On March 9, 2018, the government produced a compact disk containing 220 pages of "additional miscellaneous documents" as well as a data drive housing 16,359 pages of "additional emails and email attachments from The University National Bank . . . to supplement the materials previously provided to you on January 23, 2018." Exhibit D at 1.

## ARGUMENT & AUTHORITIES

### I.     Legal Standard.

Typically, "'[a] grand jury proceeding is accorded a presumption of regularity . . . .'" *United States v. Jackson*, 863 F. Supp. 1449, 1453 (D. Kan. 1994) (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991)). But "'[o]nce a defendant has been indicted, the government is precluded from using the grand jury for the sole or dominant purpose of obtaining additional evidence against him.'" *Id.* (quoting *United States v. Thompson*, 944 F.2d 1331, 1337 (7th Cir. 1991)). Indeed, in this Circuit, it "is improper to use the grand jury for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery, although that may be an incidental benefit." *United States v. Gibbons*, 607 F.2d 1320, 1328 (10th Cir. 1979) (collecting cases from the First, Second, Fifth, and Sixth Circuits); *see also United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972) ("[T]he government should not

use the grand jury for the sole purpose of pretrial discovery in cases in which an indictment has already been returned.").

"As used in *Gibbons*, and in the cases cited by it, impermissible 'strengthening' means using the factfinding function of the grand jury solely or principally to improve the government's case as to the evidence." *Jackson*, 863 F. Supp. at 1454 (citing *Gibbons*, 607 F.2d at 1328). Thus, the government abuses the grand jury process where it leverages the grand jury "to gather or discover additional evidence, to preserve a witness's testimony, or to lock-in a witness's testimony." *Id*. (citing *United States v. Jenkins*, 904 F.2d 549, 559 (10th Cir. 1990)) (emphasis added). Stated simply, the government cannot use "the grand jury principally to prepare pending charges for trial." *United States v. Flemmi*, 24 F.3d 24, 28 (1st Cir. 2001); *see also Jackson*, 863 F. Supp. at 1453 (explaining that an abuse of the grand jury process occurs where the government's primary purpose "was to collect evidence relating to pending charges.").

An abuse of the grand jury process typically requires dismissal of an indictment or exclusion of evidence collected improperly. *See*, e.g., *Bank of Nova Scotia v. United States*, 487 U.S. 250, 253 (1988) (holding that a federal district court may "dismiss an indictment for errors in grand jury proceedings" where those errors prejudiced the defendant); *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985*, 767 F.2d 26, 29 (2d Cir. 1985) (stating "it may be appropriate to enforce the rule against using a grand jury subpoena predominantly for trial preparation simply by barring use at trail of evidence obtained pursuant to the subpoena").

To prevail on a motion seeking dismissal or exclusion, a defendant need only show: (1) an abuse of the grand jury process, and (2) prejudice resulting from that abuse. *See Bank of Nova Scotia*, 487 U.S. at 256; *Jenkins*, 904 F.2d at 559-60; *see also In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985*, 767 F.2d at 29 (explaining that when examining the propriety

7

of a grand jury subpoena, courts "must give more scrutiny than would be appropriate under the 'clearly erroneous' standard.").

## II. The Government Has Abused the Grand Jury Process and Prejudiced Mr. Gregory.

As explained above, the government cannot leverage the grand jury primarily to marshal additional evidence or lock-in testimony in support pending charges. Nor can it use a grand jury solely or primarily as a discovery mechanism against an indicted defendant. But, despite those clear prohibitions, here, the face of the November 9, 2017 UNB Subpoena, communications with government counsel, the Proof of Service included with the Ryan Subpoena, and the transcript of Mr. Ryan's grand jury testimony reveal that the government employed the grand jury to perform each of those impermissible and prejudicial functions. Indeed, no dispute exists on at least three crucial points:

*First*, on December 1, 2017, the grand jury returned the Indictment, advancing charges only against Mr. Gregory. The Indictment also identifies a universe of alleged, unnamed co-conspirators, aiders and abettors, "Borrowers," and "Victim Banks" who, the government contends, participated in or were harmed by the conduct alleged in Counts 1 through 7. And while many go unnamed, the Indictment's detailed allegations demonstrate that the government knows the identity of those persons and entities as well as the role that each played in the conspiracy alleged. Still, the government has filed no charges against those persons or entities.

*Second*, no dispute exists that the government caused the grand jury to issue the UNB Subpoena, which called for UNB to produce documents on December 20, 2017 (*i.e.*, 19 days after the Indictment issued). *See* Ex. A at 1. The government has confirmed that the grand jury issued that subpoena before it returned the Indictment against Mr. Gregory. *See* Ex. A at 1; Ex. B at 1. It also acknowledged that the subpoena remained outstanding after the Indictment issued

on December 1, 2017.  *See* Ex. B at 1.  One month later, on January 2, 2018, the government informed counsel for Mr. Gregory that it had "just received a new production that appear[ed] to contain tens of thousands of pages of documents."  Ex. B at 4.  The government also told defense counsel that it was processing that new production and working quickly to get it "turned around to you."  Ex. B at 4.  And when it made that production to counsel for Mr. Gregory, the government acknowledged that it contained tens of thousands of pages of "emails and email attachments that were provided by The University National Bank."  Ex. C at 1; *see* Ex. D at 1.

*Third*, the government served the Ryan Subpoena on the same day the Indictment issued.  *See* Ex. E.  That subpoena compelled Mr. Ryan to testify before the grand jury 19 days after the Indictment.  Ex. E.  And, as set out extensively above, the government's questioning of Mr. Ryan focused almost entirely on Mr. Gregory and the allegations in the Indictment.  Indeed, while testifying before the grand jury, Mr. Ryan referred to the Indictment on three separate occasions to explain an answer or justify prior suspicions.  For example, during its questioning, the government asked Mr. Ryan if he had learned that loan delinquencies by certain Bluejay members had been "satisfied by money that ultimately came from the first draw of the Bluejay loan"—a question corresponding directly with Paragraphs 17-19 of the Indictment.  Ex. F at 56; *see also* Doc. 1 at ¶¶ 17-19.  In response, Mr. Ryan testified:  "Yeah.  I mean, reading the Indictment and reading some other documents, I've learned that."  Ex. F at 56.

    **A.**    **Grant Ryan's Post-Indictment Testimony Constitutes an Abuse of the Grand Jury Process and Has Prejudiced Mr. Gregory.**

The government has abused the grand jury process and prejudiced Mr. Gregory through the compelled, post-Indictment testimony of Grant Ryan.  This District recognizes that an abuse of the grand jury occurs where it "is used solely or primarily to gather or discover additional evidence, to preserve a witness's testimony, . . . or to lock-in a witness's testimony."  *Jackson*,

863 F. Supp. at 1454 (citing *Jenkins*, 904 F.2d at 559).  Here, the government employed the grand jury in violation of each of those prohibitions.

For one, the transcript of Mr. Ryan's grand jury testimony demonstrates that the government's primary objective when eliciting Mr. Ryan's testimony was to gather additional evidence post-Indictment and improperly bolster the charges currently pending against Mr. Gregory.  *See Jenkins*, 904 F.2d at 559; *Jackson*, 863 F. Supp. at 1453 ("'Once a defendant has been indicted, the government is precluded from using the grand jury for the sole and dominant purpose of obtaining additional evidence against him.'" (quoting *United States v. Thompson*, 944 F.2d 1331, 1337 (7th Cir. 1991))).  Indeed, as shown in the table above, a review of Mr. Ryan's testimony reveals that the government dedicated over 80 percent of its time questioning Mr. Ryan about Mr. Gregory, his conduct at UNB, and other facts and allegations contained in the Indictment.  *See* Table *supra* at pp. 4-5; *see generally* Doc. 1; Ex. F.  Such questioning, by itself, constitutes a clear misuse of the grand jury process.

Moreover, the government also has used the grand jury, post-Indictment, to impermissibly preserve and lock-in Mr. Ryan's testimony.  *See United States v. Fisher*, 455 F.2d 1101, 1104 (2d Cir. 1972) (holding where the government "froze" witness testimony after an indictment, its "conduct cannot be justified, and should not be repeated . . . .").  Doing so, it has materially prejudiced Mr. Gregory's defense by allowing mere allegations in the Indictment to influence Mr. Ryan's grand jury testimony.  Indeed, Mr. Ryan expressly referred to the Indictment's pointed allegations on three separate occasions to explain an answer or draw a conclusion based on his otherwise limited knowledge.

For example, the government questioned Mr. Ryan about Mr. Gregory's reports concerning the financial strength of Bluejay members and the collateral that they had pledged for

the Bluejay Loan. *See* Ex. F at 70. Mr. Ryan's answers to the government's questions indicate that the Indictment had led him to certain conclusions or, at minimum, strengthened uncertain suspicions. In particular, Mr. Ryan testified:

> Q. We have been talking about the liens, the CDs, kind of the financial position. Was any of this information, to your knowledge, conveyed to the loan committee at the time the loan was approved in December of 2007?
>
> A. No, I don't recall it.
>
> Q. And was it conveyed to the participants, to your knowledge, at that time or afterward?
>
> A. I have no knowledge that it was.
>
> Q. Okay. ***Knowing what you found out later about the Bluejay loan, had you known at the time the - - the loan was presented by Troy*** [***Gregory***], ***would you have voted to approve that loan?***
>
> A. ***No. I mean if - - if the write-up would have been presented the way the Indictment reads, no***.

Ex. F at 70 (emphasis added).

Later, Mr. Ryan again referred to the Indictment to opine that Mr. Gregory might have falsified a loan write-up and concealed it from UNB's president:

> Q. But like - - like in any situation, when you have a supervisor, if you have a tough call or . . . something you want to get signed off on, that's something that typically happens, right? Like if you - - when you were a junior lender or when you worked for Troy, you were working through something, you didn't know which way to go, or whatever, what would have been your practice - -
>
> A. The thing I don't know is I don't know the story that he told Todd [Sutherland]. And as we see in the write-up, you know, ***the glorified two-page write-up for Quinton Properties is drastically different than the Indictment***.
>
> Q. Yeah.
>
> A. I think a lot of times that's probably what Todd got, was the sweet half-page memo, and . . . until everything comes to a screeching halt or a train wreck, you . . . probably don't ask a lot of questions.

11

Ex. F at 112-13 (emphasis added).

Finally, Mr. Ryan testified that he had "learned" that certain loan deficiencies had been satisfied by "the first draw of the Bluejay loan" by "*reading* [the allegations contained in] *the Indictment and some other documents* . . . ." Ex. F at 56 (emphasis added).

The government thus has abused the grand jury process. It has used the grand jury and Mr. Ryan's testimony for the improper and dominant purpose of strengthening its case on the pending charges asserted against Mr. Gregory. To be sure, Mr. Ryan's testimony (directed by government questioning) centered predominantly on Mr. Gregory and matters already addressed in the Indictment. And by waiting to question Mr. Ryan until after the Indictment issued, the government has elicited and locked-in testimony explicitly colored by the Indictment's allegations. Preservation of witness testimony post-Indictment, *alone*, constitutes an abuse of the grand jury process. *See, e.g.*, *Jackson*, 863 F. Supp. at 1454. Here, the Indictment's influence on Mr. Ryan's testimony has materially prejudiced Mr. Gregory and his defense in a manner requiring dismissal of the Indictment or, at minimum, exclusion of Mr. Ryan as a government witness.

### B. The UNB Subpoena and Government's Post-Indictment Document Production Prejudiced Mr. Gregory.

The government also has abused the grand jury process and prejudiced Mr. Gregory for a second, independent reason. Generally, grand jury proceedings and records are secret. *See, e.g.*, *Jackson*, 863 F. Supp. at 1455-56. Here, however, it is evident that the UNB Subpoena and the government's "new production" constitute improper grand jury evidence, gathered in violation of federal law. *See, e.g.*, *Gibbons*, 607 F.2d at 1328; *Star*, 470 F.2d at 1217; *Jackson*, 863 F. Supp. at 1453 ("Quite simply, the prosecution cannot use the grand jury process principally to supplement its pretrial discovery on a pending indictment."). Indeed, the timeline preceding its

receipt of the post-Indictment evidence and the government's subsequent production makes clear that the dominant purpose of the UNB Subpoena was to discover additional evidence supporting the charges pending against Mr. Gregory.

The grand jury never considered the information requested in the UNB Subpoena before returning its seven count Indictment.  Thus, as applied to Mr. Gregory, such information must amount to additional, post-Indictment evidence gathering.  Also, as relevant here, Federal Rule of Criminal Procedure 16(a)(1)(E) requires that the government grant a defendant access to an item in its possession only if: "(i) the item is material to preparing the defense; [or] (ii) the government intends to use the item in its case-in-chief at trial."  The government's production of its post-Indictment, grand jury evidence obtained via the UNB Subpoena to Mr. Gregory (the only indicted defendant) therefore establishes that such evidence is germane to the changes already levied against him.  *See United States v. Wood*, 915 F. Supp. 1126, 1134 (D. Kan. 1996) ("[E]vidence is material as long as there is a strong indication that . . . [it] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." (internal quotation omitted)), *rev'd on other grounds*, 106 F.3d 942 (10th Cir. 1997).

The government's improper use of the grand jury has prejudiced Mr. Gregory's defense.  By obtaining documents from UNB after issuance of the Indictment, the government has converted the grand jury into a discovery tool expressly prohibited by federal law.  *See, e.g.*, *Gibbons*, 607 F.2d at 1328; *Jackson*, 863 F. Supp. at 1454.  It also has flooded this case with an additional "tens of thousands of pages of documents."  Ex. B.  That flood follows not only the Indictment, but also at least a five-year investigation into the Bluejay Loan, during which the government collected, examined, and produced thousands of pages of documents from a number

of sources, including UNB.  The grand jury never considered the government's new documents before indicting Mr. Gregory.  And it is uncertain whether those documents carry any substantive, non-cumulative evidentiary value for the government's case or Mr. Gregory's defense.  Nevertheless, Mr. Gregory and his counsel now must expend substantial (and finite) preparation time and resources reviewing, cataloging, and evaluating the tens of thousands of pages of new documents acquired because of the government's grand jury abuse.  Diverting such time and resources to counter the government's illegal misuse of the grand jury has and will continue to prejudice Mr. Gregory's ability to prepare for trial on the charges pending against him.

The government, through its use of the UNB Subpoena and resulting document production, abused the grand jury process and prejudiced Mr. Gregory's defense.  Thus, Mr. Gregory respectfully requests that the Court issue an order dismissing the Indictment.  Alternatively, Mr. Gregory requests that the Court issue an order barring the government from introducing in its case-in-chief any of the "tens of thousands of pages of documents" that it obtained impermissibly pursuant to the UNB Subpoena.

## **CONCLUSION**

For reasons explained above, the government has impermissibly abused the grand jury process and prejudiced Mr. Gregory's defense.  Mr. Gregory therefore respectfully requests that the Court issue an Order dismissing the Indictment.  In the alternative, Mr. Gregory requests that the Court issue an order excluding Mr. Ryan as a witness at trial and barring use by the government in its case-in-chief of any documents obtained improperly pursuant to the UNB Subpoena, as federal law requires.

Dated:  June 29, 2018

Respectfully submitted,

**BERKOWITZ OLIVER LLP**

/s/ James L. Eisenbrandt
James L. Eisenbrandt          KS Bar #6839
Christina M. Wahl             KS Bar #23406
Carson M. Hinderks            KS Bar #25079
2600 Grand Blvd., Suite 1200
Kansas City, MO  64108
(816) 561-7007 (Telephone)
(816) 561-1888 (Facsimile)
Email:  jeisenbrandt@berkowitzoliver.com
Email:  cwahl@berkowitzoliver.com
Email:  chinderks@berkowitzoliver.com

*Attorneys for Defendant Troy A. Gregory*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ James L. Eisenbrandt
*Attorney for Defendant Troy A. Gregory*