**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-20079-CM |
| | ) | |
| **TROY A. GREGORY,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Before the court are two motions:

I. Defendant's Motion to Dismiss Indictment (Doc. 23) ("First Motion to Dismiss"); the government's response (Doc. 29); and defendant's reply (Doc. 45).

II. Defendant's Motion to Dismiss Indictment or, in the alternative, Exclude Post-Indictment Grand Jury Evidence (Doc. 25) ("Second Motion to Dismiss"); the government's response (Doc. 28); defendant did not file a reply.

The Court will rule on each motion in turn. But first, some necessary background.

The Indictment charges defendant with conspiracy to commit bank fraud (Count 1), bank fraud, (Counts 2-5) and false statements in bank records (Counts 6-7). (Doc. 1.) The Indictment is the result of a multi-year criminal investigation into, primarily, John Duncan and his business(es) for allegedly fraudulent banking activities. The IRS commenced the investigation in the fall of 2011, but other government agencies, including the Federal Deposit Insurance Corporation, Office of Inspector General ("FDIC") and the United States Attorney's Office for the District of Kansas ("USAO"), soon joined the investigation. The criminal investigation of Duncan lasted approximately two years, culminating with Duncan pleading guilty to three counts: bank fraud, money laundering, and false statements. *See United States v. John Wyatt Duncan*, Case No. 13-40013-01-JAR, Dkt. 20 (D. Kan. September 11, 2013). In

2014, Duncan was sentenced to 57 months of imprisonment and restitution in the amount of $6,923,622. *See id.* Relevant to this case is the bank fraud to which Duncan pleaded guilty, as the alleged victim was Kaw Valley National Bank of Topeka, Kansas, ("KVB"). Enter KVB's private, civil attorneys, Patricia Hamilton and Bradley Finkeldei of Stevens & Brand LLP (collectively, the "S&B Attorneys").

According to the government, it interviewed Ms. Hamilton as part of its investigation into Duncan's actions because KVB was the victim and she its representative. At this point, around 2011, Hamilton and the government began communicating about the on-going investigation.

Parallel to the government's investigation was a civil suit in Douglas County, Kansas, in which University National Bank ("UNB")—where defendant Gregory formerly worked as a loan officer during the relevant time period—sued KVB and others for judgment on a promissory note. *See University National Bank v. JMD, LLC* (Case No. 2011CV560) (the "Civil Suit"). The case involved Duncan's banking activities, and it lasted until February 2016. For almost five years, the S&B Attorneys exhaustively investigated the underlying facts, which included defendant Gregory's conduct, and litigated the Civil Case for KVB until it ended when the court granted summary judgment for UNB, ruling against KVB. *Id.* (*See also* Doc. 23-2.)

But all the while, the government—which, importantly, was never a party to the Civil Case—continued its investigation through the present. According to defendant, from 2011 through defendant's Indictment on December 1, 2017, the S&B Attorneys communicated extensively with the government. Defendant tabulates over 430 email communications and twenty instances of communications in person or by phone. At least 160 of those communications occurred *after* the S&B Attorneys lost their Civil Case. And communications also occurred *after* defendant's indictment, including communications with the government's current counsel. These communications between the government and the S&B Attorneys form the basis of some of defendant's motions.

### I. Dismissal Is Not Appropriate

In both his First and Second Motions to Dismiss, defendant requests the court dismiss his Indictment. The court will not do so on either motion.

With respect to defendant's first motion, the court notes that defendant does not offer a specific basis, e.g. something in Federal Rule of Criminal Procedure 12(b)(3), upon which to seek dismissal. He argues the S&B Attorneys' extensive contacts and interactions with government investigators and prosecutors, as detailed in Section II, constitute "special circumstances that suggest the unconstitutionality or even the impropriety of th[e] criminal prosecution" that violate his due process rights and thus warrant dismissal of the indictment. *United States v. Kordel*, 397 U.S. 1, 12, (1970). That vague dicta is the extent of defendant's argument, even though he repeatedly mentions the quantity and severity of the S&B Attorneys' involvement with the government during its investigation. But, as in *Kordel*, this is not a case where *the government* was prosecuting a parallel civil case. Nor is it a case in which the government failed to advise the defendant in a civil proceeding that it contemplates his criminal prosecution. Here, the parallel case is a private civil suit, and there is evidence that defendant Gregory was, at some point during the Civil Suit and thus the investigation leading to this Indictment, informed that the criminal investigation was ongoing because, he invoked his rights under the Fifth Amendment, presumably on the advice of his counsel. (Though, eventually, he was deposed in the Civil Case.) Whatever the relationship between the S&B Attorneys and the government may be, the court finds there are no circumstances, special or otherwise, that suggest this prosecution is unconstitutional or improper.[1] *Id*. at 12.

---

[1] As will be discussed later, there may be sufficient evidence to support the court granting him his two alternative reliefs. But even if that is the case, the court does not find those interactions sufficient to warrant wholesale dismissal of the Indictment.

Dismissal is also unwarranted on the grounds in defendant's second motion. Defendant argues the government abused the grand jury process by collecting evidence *after* he was indicted. Dismissal of the indictment is appropriate only where the established grand-jury violation(s) either (1) substantially influenced the grand jury's decision to indict, or (2) provides "grave doubt" that the decision to indict was free from substantial influence of the violation(s). *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). Even assuming that these subpoenas and resulting testimony constituted an abuse of the grand jury process, defendant offers no evidence that the grand jury's decision to indict him would have changed absent these violations. Further, defendant was indicted *before* any of those violations, or the effects of those violations, occurred. The grand jury's decision to indict, therefore, would not have come out differently. The court declines to dismiss the Indictment on this ground.

Because dismissal is not appropriate, the court denies defendant's motions to dismiss (Docs. 23 & 25) with respect to his request for dismissal as relief. But defendant also requested additional relief in both motions to dismiss. The court will analyze those requests now.

**II. First Alternative Relief: Declare the S&B Attorneys government agents.**

Defendant first argues, in the alternative, that the court should find the S&B Attorneys are not private parties but government agents with respect to the investigation underlying his Indictment.

After reviewing the parties' briefing, the court determined it believed neither party had provided a proper legal standard under which to evaluate whether the S&B Attorneys could be considered agents of the government—i.e. state actors.[2] As a result, the court ordered the parties to provide additional briefing on the proper legal standard in which to analyze state action by a private party (Doc. 64), citing *Brophy v. Ament*, which outlined the four potentially-applicable tests under Tenth Circuit law. No. CIV

---

[2] The court notes that both parties did cite cases applying other, factor-based tests, each of which made some sense in the context of the party's argument but all of which seemed, to the court at least, disconnected and ultimately unpersuasive as a standard that the court could use to resolve this motion. In retrospect, the government advocated part(s) of the test it now offers in its supplemental brief.

07-0751 JB/KBM, 2009 WL 5206041, at *9 (D.N.M. Nov. 20, 2009). The court, as the government noted, referred to *Brophy* merely as an example of the type of analytical framework for which it was searching. The court was aware, even as it ordered additional briefing, that *Brophy* may not even adopt a relevant standard; but the court felt it may help the parties advocate an appropriate test. Nevertheless, the court gave defendant an opportunity to respond to the government's newly-advocated standard. (Doc. 68.) Defendant claims the test is inapplicable because it is a discovery-based test and then proceeds, once again, to list all of the contacts between the government and the S&B Attorneys. (Doc. 69.) Having reviewed the parties' additional briefs (Docs. 65, 66 & 69), the court is ready to rule on defendant's alternative relief in his first motion to dismiss (Doc. 23).

Under any of the legal standard(s) advocated for in the parties' briefs, the court declines to declare the S&B Attorneys government agents. While defendant sets forth a litany of contacts between the government and the S&B Attorneys, he has not adequately connected those contacts to a violation of a recognized due process right. Defendant claims the relationship "undermined the criminal investigation." Dkt. 23 at 21, 25. Defendant has the burden of demonstrating a deprivation of a constitutional right. He has not done so, and his reliance on *Kordel*'s vague dicta cannot carry the burden.

### III. Second Alternative Relief: Exclude Post-Indictment Grand Jury Testimony & Documents

Defendant argues the government's use of the grand jury after indicting him is improper. (Doc. 25.) He takes issue with two subpoenas and the resulting evidence, urging these abuses warrant dismissal of the Indictment or, alternatively, the exclusion of the evidence. On November 9. 2017, the grand jury issued two subpoenas: one for Grant Ryan—a probable government witness in this case—to testify ("Ryan Subpoena"), and one for certain documents from UNB—defendant's former employer—to be returned to the grand jury ("UNB Subpoena"). Both subpoenas were due on December 20, 2017; neither mentioned defendant. UNB's counsel quickly requested additional time to respond given the scope of

the document request to which the government agreed. The grand jury indicted defendant on December 1, 2017. Nevertheless, and as requested, Grant Ryan—a witness who could be expected to testify at defendant's trial—testified before the grand jury on December 20. UNB ultimately produced many thousands of pages of documents (twice in January 2018 and again on March 9, 2018).

The parties agree on the applicable standard. "'A grand jury proceeding is accorded a presumption of regularity . . . .'" *United States v. Jackson*, 863 F. Supp. 1449, 1453 (D. Kan. 1994) (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991)). "The grand jury process is abused when the prosecutor uses it 'for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery, although this may be an incidental benefit.'" *United States v. Apperson*, 441 F.3d 1162, 1189 (10th Cir. 2006) (citing *United States v. Gibbons*, 607 F.2d 1320, 1328 (10th Cir. 1979) (collecting cases from the First, Second, Fifth, and Sixth Circuits))). Strengthening, and therefore abuse, occurs when the government uses the grand jury solely or primarily to (1) acquire additional evidence, (2) preserve a witness's testimony, (3) pressure a witness, (4) lock-in a witness's testimony. *See, e.g., Jackson*, 863 F. Supp. at 1454. But "where there is another legitimate purpose behind the grand jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit." *Gibbons*, 607 F.2d at 1328. This rule, although easy to state, "is difficult, if not impossible, to enforce.'" *Jackson*, 863 F. Supp. at 1453; *see also* 2 Sara Sun Beale et al., *Grand Jury Law and Practice* § 9:16 (2d ed.).

In the alternative of dismissal, defendant requests the court exclude (1) Ryan as a trial witness and (2) the documentary evidence acquired by the government from the UNB Subpoena. The government admits two important points. First, there was no reason forcing the grand jury to indict defendant Gregory before either Ryan testified or UNB produced its documents. (*See* Doc. 28-1 at 6

("there were no imminent statute of limitations issues that forced the government to seek an indictment.").) Indeed, as the government states,

> [i]f the government was really intent on obtaining additional evidence … for use against Defendant on the charges found in the Indictment … the most logical course of action would have been to wait to present the Indictment to the grand jury until after the additional evidence was obtained …, since the government had already contemplated, identified, and issued the subpoena[s] … prior to the Indictment.

(*Id.*) Second, the government knew "(1) that Ryan appeared to have substantially changed his testimony between a 2013 deposition, an interview with the government, and a subsequent 2015 deposition; (2) Ryan had previously indicated that he was concerned that [Individual-1] would spend large amounts of money to destroy him; (3) Ryan lived next door to Defendant and had known him for many years; and (4) [Individual-1] and the Defendant stood to gain the most by changes in Ryan's testimony." (Doc. 28-1 at 9.)

Taken together—the government's admission that nothing forced its hand in seeking defendant's indictment when it did, its knowledge regarding Ryan as a witness, and its chosen order of operations—whether executed intentionally (i.e. strategically) or not—make affording a "presumption of regularity" to the grand jury proceedings very difficult. *Cf. Jackson*, 863 F. Supp. at 1453. Regularity, it seems to this court, is precisely what the government claims it could have done: seeking defendant's indictment *after* it obtained the testimony or evidence from the Ryan and UNB Subpoenas. (*Id.* at 6.) That order of operations is unquestionably proper under existing precedent.[3] Proceeding in that way would have avoided—and would avoid in future cases—asking the court to apply a rule that, for decades, numerous federal courts have found "easy to state … [but] difficult, if not impossible, to enforce." *Jackson*, 863 F. Supp. at 1453.

---

[3] The court questions whether that would necessarily be the case under these facts. But the court need not decide that issue now.

This case is no exception. The court must now apply the rule to the Ryan Subpoena and the UNB Subpoena.

### *a. Grant Ryan's post-Indictment testimony*

The government argues that the reason this timeline occurred is that it was investigating, among other things, charges of witness tampering against defendant Gregory and/or Individual-1. This, it says, was the legitimate purpose in calling Ryan, the possibly-tampered-with witness. It is true that legitimate uses of the grand jury include exploring possible additional charges against the same defendant and continuing to investigate potential charges of unindicted participants. *See Grand Jury Law and Practice* § 9:16 (2d ed.) (collecting cases). Where, as here, a legitimate use has been asserted by the government, a defendant must show the government called Ryan not in service of the stated legitimate use(s) but for the primary purpose of gathering additional evidence, preserving a witness's testimony, or freezing a witness's testimony. *Jackson*, 863 F. Supp. at 1453.

"This fine line is difficult to plot and, in most instances, determining whether a prosecutor has overstepped it will depend on the facts and circumstances of the particular case." *United States v. Flemmi*, 245 F.3d 24, 28 (1st Cir. 2001). To help, courts look at whether a grand jury returns new indictments with additional charges or defendants. *Id*. (collecting cases); *see also United States v. Alvarado*, 840 F.3d 184, 190 (4th Cir. 2016). If so, the presumption of regularity generally persists. If not, the case "turns on whether the facts, viewed objectively, reveal a proper justification for the government's continued resort to the grand jury." *Flemmi*, 245 F.3d at 28.

Here, the grand jury has not returned new indictments with additional charges or defendants, but the investigation remains ongoing.[4] (Sealed Doc. 63.) Yet, the circumstances presented here can be

---

[4] Should the investigation ultimately produce either type of additional charge(s), the court will not foreclose the possibility of revisiting this decision. But the court cautions that it is not *inclined* to revisit its decision here, as it would seem exceptionally difficult to discern whether the returned charges were inevitable or a direct result of this decision, so as to change this decision.

viewed in two ways. It is, of course, plausible that nothing irregular was present—that Ryan was called for the legitimate purpose of investigating witness tampering, whether by defendant or Individual-1. The grand jury transcript[5] reflects this. Ryan was questioned about his testimony's inconsistencies and whether anyone influenced his testimony. But it is also plausible that this was not the government's *primary* purpose in calling Ryan. The primary purpose being, as defendant argues, to freeze Ryan's testimony in a manner favorable to the government. The grand jury transcript can be read to reflect this, too.

Increasing the plausibility of that purpose is the fact that Ryan appears to be a "tentative witness." He is a tentative witness in two distinct ways. First, he apparently expressed, at some point, concern(s) with testifying in this criminal case, such that the government was investigating whether he was the target of witness tampering by defendant and/or Individual-1. Second, he previously gave inconsistent testimony, some sworn, in the related Civil Case as well as in his five interviews with government investigators. The first goes to preserving a witnesses testimony, the second to freezing a witness's testimony. Although the first cannot be dismissed out of hand,[6] the court will focus on the second purpose because it believes that, between the two, the second purpose has more evidentiary support in the record.

What concerns the court is what appears to be the possible beginning of "testimony laundering." Defendant does not expressly say that, but the facts and circumstances he points to do. Testimony laundering occurs in two steps. One: the government seeks to use the grand jury to sanitize the testimony

---

[5] The court notes that, unlike most cases involving grand jury testimony, there is no argument over whether defendant is entitled to see the relevant grand jury transcript. Nor is there any request or need for *in camera* review of the transcript. Rather, the government simply provided it to defendant and the court.

[6] It is possible Ryan was called to preserve his testimony so that if, as Ryan and perhaps the government believed, Individual-1 may "destroy" him for testifying, the government would have his testimony for use at trial. This seems unlikely given that Ryan had not been shy about testifying, having testified twice under oath in the Civil Case and having met with government investigators at least five times. While it is a possibility, the court focuses on, from its vantage point, the more evidenced-based potentially-improper purpose.

of a tentative witness—one who has previously given inconsistent testimony, especially prior sworn testimony—so that the result (the witness's grand jury testimony) contains that witness's testimony in a manner favorable to the government and free from cross-examination.[7] Two: the government intends or attempts to introduce the witness's grand jury testimony at trial.

Defendant notes the government spent over 80% of its time questioning Ryan about Mr. Gregory, his conduct at UNB, and other facts or allegations contained in the Indictment. The government explains that this should be expected because an investigation into witness tampering will necessarily focus upon the witness's previous testimony of the underlying facts of the case. In general, the court would agree with that explanation. But not here.

The government says it had Ryan testify to the underlying facts of the case "to determine whether Ryan's testimony had changed or been tampered with and for which a useful comparison could be made with his prior testimony." (Doc. 28-1 at 10.) The latter reason—a useful comparison with his prior testimony—is precisely what concerns this court, especially if the government intends to use it at trial. The former reason—exploring witness tampering—also fails scrutiny. The government spent eighty-one pages of testimony exploring the underlying facts of the case (with, as defendant points out, a heavy emphasis on defendant), nine pages inquiring about purported inconsistencies in his testimony, and eight pages exploring whether he had been contacted and/or influenced in any way by defendant or Individual-1. (*Id*.) From a numbers perspective, it is difficult to see how the government's *primary* purpose in calling Ryan was to investigate changes in Ryan's testimony such that potential witness tampering charges may follow when it spends only 17% of its time doing so. And the government explored only four inconsistencies. (Doc. 28-8 at 83-91.) Three of which do not appear to be inconsistencies. (*See*

---

[7] In many ways, it is the reverse concern of what the government argues for in its Omnibus Motion In Limine. (*See* Doc. 39 at 26.) As the government points out, the Tenth Circuit has consistently held that civil depositions that took place in litigation where the government was not a party may not be admitted in a federal criminal trial under Rule 804(b)(1).

Doc. 28-8 at 84:11–86:14 (asks about Ryan's prior testimony that implied he did not believe anyone was harmed with respect to funding the allegedly-sham CDs so as to attempt to get Ryan to admit someone *could be harmed* by defendant and his coconspirators' conduct), 87:15–89:13 (asks about Ryan's prior testimony that Duncan and a Dave Freeman made misrepresentations or had a lack of transparency to inquire whether, other than those two, *someone else* made misrepresentations or was similarly lacking in transparency), 89:14–17 (asking about Ryan's prior testimony that there was no scheme between UNB and the organizing bank so as to inquire if Ryan thought there was a scheme here)[8]). In that third non-inconsistency, the government also asks: "So you're not … walking away from some of the things we talked about today…about what the documents show?" (Doc. 28-8 at 91.) This undercuts the government's argument that it was probing changes between his "2013 deposition, an interview with the government, and a subsequent 2015 deposition[.]" (Doc. 28-1 at 9.) It instead implies Ryan's prior testimony differed from his grand jury testimony.

For all of these reasons, the court finds it cannot "accept at face value the prosecution's word that the dominant purpose of the grand jury proceedings is proper[.]" *Jackson*, 863 F. Supp. at 1453 (citation omitted). The primary purpose appears to be freezing the testimony of a tentative witness for use at trial. That is improper. The court, however, will not grant defendant its requested remedy: wholesale exclusion of Grant Ryan as a trial witness. The court believes that is too drastic. But the court will preserve the status quo by excluding Ryan's *grand jury* testimony from trial, including for impeachment purposes. The government appears to accept this result. (Doc. 28-1 at 15 ("Finally, in addition to the fact that Ryan's testimony took place after Indictment and, thus, could not have had an effect on the

---

[8] The fourth purported inconsistency involved how a letter he wrote to his superiors in which he raised concerns about "fraudulent activities and misrepresentations" was consistent with his later testimony in which he refused to say someone "absolutely committed fraud [in the legal sense.]" (*Id*. at 82:5–84:10.) The court is not sure it constitutes an inconsistency, but it will give the government the benefit of the doubt. The government does not cite to the one true instance of it probing an inconsistency. (Doc. 28-8 at 79.) Perhaps because Ryan promptly commits to his prior testimony.

-11-

grand jury's decision to indict, the government acknowledges that this testimony (or any testimony based on it) would be inadmissible at trial and, therefore, cannot strengthen the government's case and cannot prejudice Defendant.").) This remedy is what the trial court fashioned in *United States v. Alvarado*, 840 F.3d 184, 190 (4th Cir. 2016), which the government cited here to justify its actions. While the Fourth Circuit overturned the trial court's remedy, it did so because the trial court did not sufficiently explain its reasoning for why excluding the grand jury testimony was necessary.[9] *Id.* at 189, 191.

### b. *UNB documents*

Defendant also requests the court exclude all documents obtained by the government via its UNB Subpoena. He claims the government improperly used the grand jury as a substitute for discovery. The government, for its part, claims it has never reviewed the documents—despite turning them over to defendant in discovery. Contrary to his showing with respect to Grant Ryan's testimony, defendant has failed to demonstrate impropriety regarding the UNB Subpoena. Investigating the involvement of defendant's employer will necessarily uncover evidence pertaining to defendant. There is no evidence the government's investigation of UNB was a pretext to using the grand jury to discover additional evidence to strengthen its case against defendant. Therefore, the court declines to exclude the documents obtained under the UNB Subpoena.

## IV. Conclusion

The court denies defendant's Motion to Dismiss Indictment (Doc. 23) in its entirety. Defendant's Motion to Dismiss Indictment (Doc. 25) is granted in part and denied in part. The government is precluded from using Grant Ryan's grand jury testimony at trial, even for impeachment purposes. But the government is not precluded from using documents obtained under its UNB Subpoena.

---

[9] *Alvarado* is further distinguishable because, there, the grand jury returned new or additional charges. As explained earlier, the presence of later charges bolsters the presumption of regularity. *Flemmi*, 245 F.3d at 28; *Alvarado*, 840 F.3d at 190.

-12-

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss Indictment (Doc. 23) is denied.

**IT IS FURTHER ORDERED** that defendant's Motion to Dismiss Indictment (Doc. 25) is granted in part and denied in part.

Dated this 15th day of January, 2019, at Kansas City, Kansas.

<u>s/ Carlos Murguia</u>
**CARLOS MURGUIA**
**United States District Judge**