## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-20079-JAR** |
| **TROY A. GREGORY,** | |
| **Defendant.** | |

### MEMORANDUM AND ORDER

Before the Court are Defendant Troy Gregory's Motion for Judgment of Acquittal and for New Trial (Doc. 123). Defendant Gregory was charged in an Indictment with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, four counts of bank fraud in violation of 18 U.S.C. §§ 1344(1) and (2), two counts of false statement in bank records in violation of 18 U.S.C. § 1005, and a Forfeiture Allegation for any property constituting, or derived from, and proceeds obtained directly or indirectly as a result of the conspiracy to commit bank fraud and the bank fraud violations charged in Counts 1–5 of the Indictment.

The jury trial began on August 6, 2019. On August 19, 2019, the jury returned a verdict of guilty on Counts 2–7 (bank fraud and false statement in bank records).[1] At the close of the Government's evidence, Defendant moved for judgment of acquittal pursuant to Fed. Crim. P. 29.[2] The Court denied the motion.[3]

---

[1] The jury was unable to reach a verdict on Count 1; and the Forfeiture Allegation, which did not identify specific property, was not submitted to the jury or the court for determination.

[2] Trial Tr. 1745–50 (hereinafter "Tr.").

[3] *Id.* at 1750–52.

After the jury returned its verdict, Defendant filed the instant motion for acquittal and new trial.  The Government filed a Response (Doc. 152) and Defendant filed a Reply (Doc. 155).  Judge Carlos Murguia presided over this case through the conclusion of the trial and until February 20, 2020 when this case was reassigned to the undersigned judge.  Carlos Murguia resigned his judicial commission effective April 1, 2020.

Pursuant to Fed. R. Crim. P. 25(b)(1), the undersigned judge finds that Judge Murguia cannot perform his duties in ruling upon the instant motion given his resignation from office.  The undersigned judge, who is the Chief Judge of this Court, certifies that she has read the trial transcript, reviewed all exhibits, read and reviewed all pertinent pleadings and documents filed pretrial, during trial, and post-trial, and has gained sufficient knowledge to decide the motion.  For the reasons explained in detail below, the Court denies Defendant Gregory's Motion for Judgment of Acquittal and for New Trial.

## I.      Motion for Acquittal

Fed. R. Crim. P. 29 allows a defendant to move for a judgment of acquittal at the close of the Government's evidence.[4]  The Court may reserve decision on the defendant's motion and proceed with trial, submit the case to the jury, and then decide the motion for acquittal before the jury reaches a verdict or after the jury returns a guilty verdict.[5]  Rule 29(c) provides that a defendant may also move for a judgment of acquittal or renew a previous motion for acquittal within fourteen days after the jury returns a guilty verdict or is discharged.[6]

The Court must consider the sufficiency of the evidence in the light most favorable to the Government and determine "whether any rational trier of fact could have found, from the direct

---

[4]Fed. R. Crim. P. 29(a).

[5]Fed. R. Crim. P. 29(b).

[6]Fed. R. Crim. P. 29(c)(1).

and circumstantial evidence presented to it, together with the reasonable inferences therefrom, the essential elements of the crime beyond a reasonable doubt."[7]

### A.    Evidentiary Background

Viewing the evidence in the light most favorable to the government, as the Court must, the evidence and stipulations presented at trial proved the following.  Defendant Troy Gregory was a senior loan officer at University National Bank (UNB), a small bank in Lawrence, Kansas. For years Defendant was the loan officer for Big D Development and Big D Construction (hereafter referred to collectively as "Big D"), two limited liability companies whose largest owner was David Freeman.  Other owners of Big D included two lawyers—William Skepnek and Brennan Fagan—and John Duncan, Jr., who managed Schmidt Builder Supply, which was owned by his wife.[8]  Defendant was also the loan officer on UNB's dozens of personal and/or commercial loans to Freeman, Skepnek, Fagan, Duncan and related business entities.

In 2006, Big D developed two residential subdivisions, called Sutter Woods and Sutter Highlands in Junction City, Kansas, financed in part with a UNB loan for which Defendant served as loan officer.[9]  But Big D soon ran into trouble with the Sutter developments.  Lots were not selling because the City had not set special assessments.  Big D was unsuccessful in getting Junction City to approve sorely needed Rural Housing Incentive District (RHID) funding.  John Larkin, owner of Larkin Excavating, testified that his invoices for excavation work went 90 to 120 days without payment.  Larkin was also a commercial customer of UNB and Defendant was the loan officer on Larkin's loans.

---

[7]*United States v. McIntosh*, 124 F.3d 1330, 1334 (10th Cir. 1997).

[8] Skepnek, Fagan and Duncan were members of limited liability companies that were the nominative members of Big D Development and Big D Construction.

[9] UNB was the originating bank on this large loan, which was participated in by other banks, including Bankers Bank of Kansas.

By June 2007, Big D owed UNB about $1.9 million on the Sutter developments and could not make the interest payments. According to Brennan Fagan, by June 2007, Big D was in a "terrible" financial position. Rhonda Scott, UNB loan administrative officer testified that at Defendant's direction she prepared a spreadsheet[10] detailing UNB's loans to Big D as of November 27, 2007; all these loans were past due at that time.

The members of Big D were not in a good financial position either. Fagan testified that he did not have much net worth. By October 5, 2017 Freeman's thirteen personal and business-related loans from UNB exceeded $10,000,000; and Scott's spreadsheet showed that all of Freeman's loans were past due as of November 27, 2007.[11]

Duncan testified that he had cash flow problems throughout this time period, leading to his conviction for bank fraud and money laundering for exaggerating his borrowing base and being untruthful to his lenders. In 2006, an entity owned by Duncan borrowed $600,000 from UNB for the benefit of Freeman and a business partner. Duncan was repeatedly late on interest payments; and Defendant caused UNB to renew this note, which Duncan never paid. In 2007, UNB loaned Duncan $600,000 to pay down some principal on a note he had with another bank; Defendant caused UNB to repeatedly renew this note and Duncan's balance on the note ultimately grew to more than $900,000. Nonetheless, in April 2007, UNB loaned Duncan $402,000 to purchase some land from Stonehouse Rentals. And in June 2007, UNB loaned Duncan $650,000 for lumber because he was having cash flow problems in his business, Schmidt Builder Supply.

---

[10] Ex. 203.

[11] *Id.*

Special Agent Shawn Nickell testified that he examined ten years of UNB account and loan history on Big D, Freeman, Duncan, Skepnek, Fagan and a number of related business entities and persons, including: Quinton Properties, Freeman Transcriptions, L&K Trucking, Planet Construction, and DT&E Properties. Over this ten-year period, these entities and individuals had hundreds of UNB loans. But with respect to this investigation, Nickell ultimately narrowed his focus to the period of July 2007 to April 2009. During that ten-month period, these individuals and business entities had 69 loans from UNB.[12]

From July 2007 to April 2008, most of these 69 loans, which totaled millions of dollars, were in past due status, as detailed in a summary exhibit prepared by Nickell.[13] Fourteen loans totaling $2.2 million were past due in July 2007; 9 loans totaling $3.7 million were past due in August 2007; 20 loans totaling $6.4 million were past due in September 2007; 17 loans totaling $5.5 million were past due in October 2017; 18 loans totaling $5.2 million were past due in November 2007; and 29 loans totaling $7.9 million were past due in December 2007. This pattern continued. In January 2008 there were 6 loans past due totaling $2.6 million; in March 2008 there were 12 loans past due totaling $3.8 million and in April 2008 there were 9 loans past due totaling $2.1 million.

Nickell also prepared a summary detailing how UNB treated the loans when they matured.[14] From July 2007 to April 2008, 70 loans were extended or renewed; only four loans were paid off. Another summary prepared by Nickell demonstrated that almost all loans were

---

[12] Nickell testified that there were approximately 30 loans to Big D where Freeman, Duncan, Skepnek or Fagan were either a borrower or a guarantor.

[13] Ex. 601.

[14] Ex. 605.

either renewed, extended, or paid off with the proceeds of other UNB loans.[15]  And many of the loans were renewed or extended multiple times.

Nickell also examined the bank accounts of Big D, Freeman, Duncan, Skepnek and Fagan. He testified that Big D Development had an account that was overdrawn 54 consecutive days and a total of 70 days from July 2007 through April 2008.  Big D Construction had an account that was 41 days overdrawn, including overdraft in the amount of $15,000 during April 2008.

As loan officer, Defendant was required to monitor his loans.  Banking expert Kaye Finn testified that banks are required to file a quarterly report on loans that are past due 30, 60 or 90 days.  In his deposition, Defendant testified that banks are required to give specific notice to their regulator, OCC, of loans that are 90 days past due and in nonaccrual status.

Fagan testified that Defendant closely monitored the loans and accounts of customers in his loan officer portfolio and spoke with Fagan weekly if not daily about the maturity dates, interest due, past due amounts, and which loans should be extended or renewed.  Fagan and Defendant even discussed the source of funds that Big D or its members remitted in payment or partial payment of interest.  Fagan further testified that the financial condition of Big D and its members was transparent and known to Defendant, as their bank accounts were at UNB, they provided their financial statements to UNB, and it was no mystery that in late 2007 they were not flush with cash.  Duncan similarly testified that Defendant was well aware of his inability to service his debt with UNB, that Duncan was not making monthly interest payments to UNB, that Duncan owed over $3 million to another bank and was unable to service his $80,000 per month in total interest payments.  Duncan testified that he was insolvent.

---

[15] Ex. 617.

In November 2007, Defendant asked Fagan how Big D would pay $55,000 in interest due on two Big D loans. Because Big D could not make the interest payments, Defendant caused UNB to loan Skepnek and Fagan the $55,000 on November 30, 2007,[16] which they used to make payments on the two loans. Skepnek and Fagan did not pay this November 30 loan when it came due 30 days later or thereafter. Similarly, on February 12, 2008, UNB loaned Freeman and Duncan $35,000[17] to make payments on other UNB loans. Freeman and Duncan did not pay this loan when it came due 30 days later or thereafter, something Scott brought to Defendant's attention.[18]

On December 13, 2007 an $842,000 UNB loan to Big D[19] matured. This loan was secured by "a house and 40 acres" property in Junction City that Big D planned to develop. Big D was unable to pay this loan. Rhonda Scott testified that because this loan had been participated out to another bank, UNB could not renew or extend it without the other bank's consent. This loan remained in past due status for 99 days, until March 31, 2008, when Luke and Sheridyn Oehlert assumed the loan.[20]

By late 2017 Freeman, Duncan and others developed a plan they hoped would generate profits that would allow them to dig out of their financial straits. Despite the difficulties Big D encountered with the Sutter single-family home residential developments in Junction City, they believed development of a large apartment complex would prove profitable. As Junction City anticipated significant population growth from a wave of incoming military personnel newly

---

[16] Ex. 458-A.

[17] Ex. 456-A.

[18] Ex. 226.

[19] UNB loaned Big D $880,000 in January 2007 and renewed the note in September 2007 in the amount of $842,000.

[20] Ex. 123.

assigned to nearby Fort Riley, market studies indicated there would be great demand for the type of apartment complex they planned to build.

To that end, Freeman, Duncan and others formed Bluejay LLC to build a 192-unit apartment complex in Junction City, called Quinton Point. At all pertinent times, the members of Bluejay LLC were Freeman, Duncan, Skepnek, Fagan and Deana Larkin, one of the owners of Larkin Excavating and spouse of John Larkin. Bluejay LLC acquired land valued at $575,000, determined the construction costs, obtained an appraisal of the complex and entered into a letter of intent for TIC Capital to purchase Quinton Point upon completion of the apartment complex. There were favorable indicators other than the demand for such a complex. The complex appraised for more than $20 million; the letter of intent to purchase was in the amount of $17.9 million and the estimated total cost of the project was about $15.6 million. Duncan and other borrowers thought this project would be their "golden goose," the "be-all and end-all to their problems."

Fagan testified that he discussed with Defendant how the profits from this Quinton Point project would hopefully clear up their debts to UNB. As Fagan put it, Defendant was committed to make this project happen. Bluejay LLC hoped to obtain a loan for $15.2 million with an equity or cash down payment requirement of no more than ten percent. To that end, on December 5, 2007, UNB prepared a "Loan Application/Purpose Statement" on behalf of Bluejay LLC[21] for submission to Bankers Bank of Kansas (BBOK) to seek other banks to participate in this large loan, which exceeded UNB's lending capacity. The loan application was signed by Michael D. Bartlow, a vice president of credit administration at UNB. But Bartlow and Rhonda Scott of UNB testified that Defendant, as Bluejay LLC's loan officer, directed, reviewed,

---

[21] At this point in time, the newly-formed entity was called Quinton Point LLC.

evaluated, and approved Bartlow's work.  This was particularly so because Bluejay LLC was a newly formed entity with no history with UNB; but its members and guarantors[22] (hereafter referred to as the "borrowers") had extensive history with UNB.  Defendant, who was the loan officer on virtually all the UNB loans to the borrowers and related business entities over many years, was well aware of their account and loan status and history.

There were several key representations in UNB's December 5, 2007 Loan Application/Purpose Statement that was directed, reviewed and approved by Defendant.  It stated that: (1) a first real estate mortgage would be filed on the property; (2) "[t]he borrowers will bring the land free and clear of any debt;" (3) existing loans of "related" parties totaled $11,317,641.93 post-participation and $4,668,507.76 pre-participation with UNB; (4) none of the borrowers had loans exceeding the legal lending limit of $2,005,214.00, as Freeman's current balance UNB loan balance was $1,981,510.76, Duncan's current UNB loan balance was $1,952,000, Skepnek's current UNB loan balance was $1,242,852.75 and Fagan's current UNB loan balance was $1,242,852.75.  The application further stated that "[f]or direct and related debt see attached schedule."  While Scott testified that she surely prepared the referenced schedule, neither UNB nor BBOK personnel could account for its whereabouts nor recall seeing it.

UNB's Loan Application/Purpose Statement for Bluejay LLC made representations about the financial condition of the borrowers, summarizing their financial statements.  And it made representations about the history of Freeman and Duncan, based on UNB's history with them.  In "Summary" the Loan Application/Purpose Statement stated

> A risk code of 4 is being assigned to this loan because of good collateral values and the financial strength of the borrowers individually and collectively.  The loan

---

[22] The guarantors were Freeman, Duncan, Skepnek, Fagan and the spouses of Freeman, Duncan and Skepnek.

officer recommends this loan for approval subject to participation in amounts to keep all borrowers within our legal lending limits.

After receiving this Loan Application/Purpose Statement, BBOK gathered information from Defendant and other UNB personnel.  There is at least one email from BBOK loan officer Craig Ellis to Defendant indicating that they communicated during this process.[23]  While neither Ellis nor Defendant testified that they communicated, UNB and BBOK personnel testified that the communications would have been between the two loan officers.  Rhonda Scott, who worked under the direction of Defendant at UNB, and Catherine Gaines and Jeanne Dailey, who worked under the direction of Ellis at BBOK, testified that their roles were administrative or ministerial; they were not engaged in substantive discussions about the borrowers and loan, that was the role of the loan officers.

Meanwhile, in January 2008, Fagan had talked to Defendant about Big D's inability to service the debt on its loans.  Fagan discussed with Defendant that lot sales in the Sutter developments continued to languish, and that Big D was unsuccessful in getting Junction City to approve sorely-needed RHID funding.

After receiving the Loan Application/Purpose Statement, and performing its own evaluation and due diligence, BBOK's board voted to approve participation in the loan, but decided to require fifteen percent in equity or cash down payment.[24]   BBOK and UNB entered into a Participation Agreement dated April 11, 2008,[25] and signed by Ellis and Defendant, that stated in pertinent part,

> Originating Bank expressly states that is [sic] has no actual knowledge, nor made any misrepresentation of fact to Purchasing Bank, regarding any material adverse credit experience with Borrower, or any other party to the Loan, including, but not

---

[23] Ex. 219.

[24] Ex. 151.

[25] Ex. 55.

limited to, overdrafts . . . or loan delinquency of 60 days or more, that has not been disclosed in writing by Originating Bank to Purchasing Bank prior to acceptance of this Participation.

BBOK prepared an "Offering" package[26] to solicit participation by other Kansas banks. This Offering package included UNB's Loan Application/Purpose Statement, the borrowers' financial statements, an itemization of the guarantors' net worth, adjusted (non-business) net worth, liquidity and other BBOK debt,[27] and other documents relating to the construction project and the market analysis of housing demand.

The Offering package also included BBOK's own "Loan Summary and Narrative." This document identified Craig Ellis and Jeanne Dailey as the BBOK loan officers and Defendant as the UNB loan officer. BBOK made several noteworthy representations in this Loan Summary and Narrative: (1) the collateral description was the apartment complex and $1,400,000 in a CD at UNB pledged to the loan; (2) that Schmidt Builder Supply would supply the lumber; (3) that UNB had reported that their experience with Freeman "has been very positive and he has shown a trend of successful operations;" and (4) that borrowers' "equity in the project is the land which is owned free and clear. A $1.4MM certificate of deposit with further enhance the loan."

BBOK further stated in the narrative and summary the combined net worth, adjusted net worth and liquidity of the guarantors, and referenced that "[t]he financial position of the guarantors is outlined by UNB in their presentation." BBOK also stated that

> [i]t is important to note that Freeman will experience a significant change and increase in his liquidity. He has received word from the City of Junction City that they will be funding, in its entirety, the reimbursements for Big D's development of the Sutter Woods and Sutter Highlands developments will occur in the near future. This will result in proceeds just shy of $4MM to Freeman that will reduce loans at UNB and other debts . . . .[28]

---

[26] Ex 153-A.

[27] It noted that Big D Development had a $1,185,162 loan from BBOK that Freeman had guaranteed.

[28] Ex. 153-A.

Notably, BBOK's Loan Summary and Narrative is dated January 25, 2008.  But BBOK did not disseminate it to potential participant banks until March 21, 2008.[29]  While Ellis did not testify at trial about communications he had with Defendant, the evidence shows that Ellis emailed the Loan Summary and Narrative to Defendant on February 1, 2008, stating, "Troy, our presentation, as we discussed."[30]  This coupled with information in BBOK's Loan Summary and Narrative indicates that Defendant and Ellis had communications during the entire process of participation offering and final loan approval, just as Rhonda Scott, Jeanne Dailey and Catherine Gaines surmised.  A reasonable jury could infer that Defendant read and approved the Offering Package, including BBOK's Loan Summary and Narrative, since it included information about UNB's borrowers.  Moreover, a reasonable jury could infer that the above-quoted statement about Freeman's liquidity increasing because of anticipated reimbursements from the City had to have come from someone at UNB who had talked to Freeman or someone associated with Big D.  Notably, Fagan testified that in January 2008 he had a discussion with Defendant about Big D getting this City funding, although he told Defendant that Big D was *unsuccessful* in getting such funding.

Between BBOK's January 25, 2008 Loan Summary and Narrative and March 21, 2008 when BBOK disseminated the Offering to potential participant banks, UNB records evidenced that the loans to Big D, the borrowers, and related entities were continually past due and maturing without payment, such that Defendant caused UNB to continually and sometimes repeatedly renew or extend each loan.  Some of the accounts were continually overdrawn as

---

[29] Ex. 153.

[30] Ex. 219.

well.  These same UNB records evidenced that these financial circumstances persisted into April 2008, before the Bluejay loan closed.

In this same time frame, January 25 through March 21, 2008, Defendant had other communications and took other actions evidencing his awareness that the financial condition of the borrowers was not strong and was deteriorating.  On January 29, Fagan discussed with Defendant that the borrowers did not have fifteen percent cash or equity, which would have been $2,280,000 on a $15.2 million loan; Fagan asked Defendant if he could get another lender who would require less than fifteen percent.  On February 12, Defendant caused UNB to loan Freeman and Duncan $35,000 to make payments on two loans.[31]  Duncan testified that Defendant never directed him to update his December 31, 2007 financial statement to reflect this February 12 loan; and BBOK never received from UNB an update of Freeman's July 2007 financial statement.  Further, on March 21, 2008, the very day that BBOK sent out the Participation Offering, Defendant acted as the loan officer on the Oehlerts' assumption of the $842,000 Big D loan guaranteed by Freeman that was 99 days past due.  In his deposition testimony, Defendant acknowledged that the effect of the Oehlert assumption was to free up $437,000 included in Freeman's legal lending limit, allowing UNB to loan Freeman additional money should it choose.  The effect was to also create an appearance that Big D had paid down its debt.  In his deposition, Defendant acknowledged that Ellis at BBOK required that Big D bring its loans current before the Bluejay loan could close.

Defendant also knew the borrowers did not individually or collectively have the required fifteen percent cash or equity for the Bluejay loan.  Moreover, some of them were near their legal lending limit.  Defendant admitted in his deposition testimony he knew Duncan was borrowing

---

[31] Ex. 456-A.

money from Schmidt Builder Supply to contribute equity for the Bluejay loan.  On March 28, 2008, Defendant caused UNB to loan Larkin $505,000.  Defendant admitted in his deposition testimony that the purpose of this loan was for Larkin to infuse equity towards the fifteen percent required for the Bluejay loan.  This nominee loan to Larkin was for the benefit of others: 250,000 went to Duncan towards a $1.5 million CD pledged as collateral on the Bluejay loan, and $250,000 went to Duncan to buy out the interest of another member of Bluejay LLC.  Defendant did not direct Duncan to update his financial statement provided to BBOK to reflect that his debt had increased by $500,000 through this UNB nominee loan to Larkin.

Sometime in March, Defendant hosted a meeting in his UNB office attended by Freeman, Fagan, Oehlert and others.  In this meeting it was decided that Oehlert—in addition to assuming Big D's $842,000 loan—would loan an additional $400,000 for the benefit of Freeman.  Oehlert testified that he thought this $400,000 would be used to develop the property securing the $842,000 Big D loan he was assuming.  Fagan testified that the $400,000 was to contribute to Bluejay's fifteen percent cash or equity requirement.  In his deposition, Defendant agreed that it was for Bluejay's equity.  But the $400,000 loan was actually used to bring a number of Big D and Freeman loans current.

Even while Defendant was aware but did not disclose to BBOK that the borrowers and related entities continued to have UNB loans in past due status as well as overdrawn UNB accounts, and could not infuse fifteen percent cash or equity to the Bluejay loan without UNB loans to them or nominees, there is no evidence that he provided updated information to BBOK about the financial situation of the borrowers and guarantors on the loan.  Nor did he direct Freeman or Duncan to correct their statements of liabilities and net worth.  Duncan testified that

his December 31, 2007 financial statement did not include $1.9 million in loans and liabilities to UNB. And his financial statement overstated the net worth of his entity JMD by $800,000.

Instead, Defendant continued to manage the Bluejay loan process through approval of the loan. BBOK required a fifteen percent down payment, which totaled $2.28 million, Fagan testified that Defendant directed the parties to meet this requirement by pledging the land, which was valued at $575,000 as well as pledging a $1.5 million CD and a $205,000 CD. But the borrowers did not have money for the CDs any more than they had money to make interest payments and keep their loans current. So, as Fagan and Duncan testified, Defendant directed a complicated series of transactions in a sequence he determined to accomplish the loan requirements so that the Bluejay loan could close.

First, there were three liens or mortgages on the Quinton Point land that had to be satisfied or released before the loan could close. UNB had a mortgage; Defendant signed the release of that mortgage. Stonehouse Rentals had a mortgage of $96,845.90 on the Quinton Point land; a UNB journal voucher[32] in Defendant's handwriting indicates that Stonehouse Rentals' lien release was recorded on April 29, 2008, the same day the Bluejay loan closed and the same day UNB disbursed $2,417,782.15 as the first draw of the Bluejay loan. Out of that first draw, $243,250.99 went to Big D, which in turn remitted it to Freeman, who in turn wrote a $96,845.90 check to Stonehouse Rentals to get this lien released. And the same UNB journal voucher[33] indicates that AWM Real Estate Fund I, LLC had a mortgage of $368,500 which was also released on April 29, 2008 when the mortgage holder's principal, Tavis Holsinger was convinced by Fagan to release that mortgage in exchange for being granted a mortgage on other

---

[32] Ex. 41.

[33] *Id.*

real property.  This took some convincing, as Defendant urged in an April 28 email to Fagan, "[w]e need to button this up today.  People are starting to get a little anxious and there are things that need to be taken care of by month end.  Please put the heat on Tavis."[34]

UNB's December 5, 2007 Loan Application/Purpose Statement represented that a first real estate mortgage "will be filed" on the land; while BBOK's January 25, 2008 Loan Summary and Narrative represented "[b]orrower's equity in this project is the land which is owned free and clear."  Defendant did not correct BBOK's statement.  Several representatives of the victim banks testified that they relied on BBOK's statement as being the latest and most accurate information and that it was material to their decisions to participate that the borrowers had $575,000 in land that was unencumbered.

After they entered into the participation agreements, on or about April 11, 2008, a Title Commitment showed that there were three liens on the property.  The victim banks testified that they did not know that these liens were satisfied in part out of the Bluejay loan proceeds and not out of cash or equity of the borrowers.  This undisclosed information would have been material to their decision whether to participate in the loan, they testified.  As Blake Heid, president of one of the victim banks put it, before deciding to participate, they wanted to see that the borrowers had "skin in the game."  But by satisfying these liens out of Bluejay loan proceeds, these borrowers did not have skin in the game in terms of infusing equity in the land.

Similarly, the borrowers did not have skin in the game with respect to the two CDs that were supposed to be part of the $2.28 million in cash or equity down payment required by BBOK.  Ellis signed the Participation Agreement between BBOK and UNB on April 11.[35]  It is

---

[34] Ex. 261.

[35] Ex. 55.

unclear whether Defendant signed it on April 11 or April 28.  In any event, this Participation

Agreement stated that the loan was secured by both an April 11 Security Agreement from Big D

Development covering a $205,000 CD and an April 11 Security Agreement from John Duncan

covering a $1,500,000 CD.  And on April 11, 2008 Defendant signed these two security

agreements on behalf of UNB.  The Big D Security Agreement described the collateral in

attached Schedule A as "CD# 0170064751 in the amount of $205,000.00 issued by Lender

maturing 10/11/09."[36]  And the Duncan Security Agreement described the collateral in attached

Schedule A as "CD# 0170064778 in the amount of $1,500,000.00 issued by Lender maturing

10/11/09."[37]

On April 11, Defendant represented in signing these Security Agreements, and in signing

a "Collateral Receipt" for each CD, that UNB actually had these two certificates of deposit, with

assigned account numbers.  But Defendant's representation was false because the borrowers had

not deposited funds at UNB in the form of these CDs.  BBOK and the victim banks were

deceived into thinking that these CDs were on deposit on April 11, to secure the loan and as part

of the borrowers' cash down payment.  In fact, these CDs were not opened until they were

funded on April 28, 2008, as part of Defendant's careful sequencing of transfers and

transactions.  For these CDs were not funded out of the cash, equity or assets of any of the

Bluejay borrowers or guarantors; they were largely funded by UNB loans, including the Bluejay

loan.

At Defendant's direction, the $205,000 CD purportedly from Big D Development was

actually funded from three sources.  First, UNB renewed the Freemans' $100,000 line of credit

---

[36] Ex. 16.

[37] Ex. 17.

on April 14, 2008 and further increased the line of credit by $50,000, of which Freeman used $47,674.17 for the CD.  And $90,337.78 came from the $400,000 that Oehlert loaned to Big D or Freeman on March 31.  Furthermore, $66,988.05 came from the $116,230.75 disbursed to Freeman out of the Bluejay loan first draw.

At Defendant's direction, the $1.5 million CD purportedly from John and Mary Duncan was actually funded by a UNB loan to the Duncans and a UNB loan to Larkin, who in turn loaned Duncan $250,000 towards this CD.  This $1.5 million CD not only served as collateral on the $15.2 million Bluejay loan, it was cross-collateralized to secure the $1.5 million loan to the Duncans, as well as one or more UNB loans on the Sutter properties.

The security agreements and collateral receipts signed by Defendant on April 11 deceived BBOK and the banks into believing that the borrowers had cash or equity totaling $1,705,000 in CDs on April 11.  Defendant did not disclose to BBOK or the victim banks that the CDs were inexistent on April 11, when the victim banks agreed to participate in the loan, and that the CDs were funded out of the Bluejay loan and the proceeds of other UNB loans to the borrowers and nominees Luke Oehlert and John Larkin.

The victim banks testified that had they known the CDs did not exist on April 11 as represented, they would not have participated in the loan.  And had they known that the CDs were funded out of the Bluejay loan and other UNB loans to the borrowers or nominees, they would not have participated in the loan.  One representative of a victim bank called it "a fraud."

To further satisfy BBOK's fifteen percent cash or equity requirement, at Defendant's direction, Duncan was to purportedly contribute prepaid lumber to Bluejay, earmarked for the construction project.  Fagan testified that at Defendant's request, in mid-April 2008, Fagan drafted a "lumber letter" for Duncan's signature, that stated that Duncan, through his entity

Schmidt Builder Supply, was going to pledge or contribute lumber to the project.  Defendant directed Fagan that the letter should state that Duncan had the lumber, it was prepaid, not encumbered, and ready for delivery.

After Duncan signed the lumber letter, Defendant directed that Duncan to produce an invoice for the lumber. Duncan testified that Defendant knew that Schmidt Builder Supply had cash flow problems and did not have the means to contribute $1.3 million in lumber. Duncan testified that he told Defendant that he could not create a $1.3 million lumber invoice in his computer system without blowing up his inventory system.  Defendant directed Duncan to figure out how to do it.  Michael McKinley who worked for Duncan, testified that he refused Duncan's request to photoshop a $1.3 million quote for lumber to make it look like an invoice.  Duncan testified that instead, one of his IT staff helped him make the quote look like an invoice.  The photoshopped quote was created in Schmidt Builder Supply's computer system, which automatically dated it April 24, 2008, the date it was created.

On April 21, Defendant and another UNB employee conducted an inventory of Schmidt Builder Supply lumber at three lumberyards, which Duncan testified added up to almost $1.3 million in lumber.  Defendant advised Ellis that he had conducted this inventory in an April 23 email.[38]  Defendant represented to Ellis that he had conducted the inventory on April 21 and had the invoice in his hands when he checked off the lumber.[39]  Defendant testified in his deposition that to demonstrate that he had conducted this inventory, he put check marks by most of the line items, signifying that he had counted and verified that the lumber was there; but Defendant put "x" marks by other line items, which meant he could not verify the quantity of the product.

---

[38] Ex. 253.

[39] *Id.*

But Duncan testified that the inventory was a "charade;" in which Defendant counted random lumber that was not the type of lumber that would be used for Quinton Point, which required specially ordered lumber that would be delivered to the construction site, not to the lumberyards. Moreover, Duncan pointed out that Defendant's "inventory" total was $1,225,000, yet a lumber invoice would never total a "round number like that." Further, the actual total of the items that Defendant check-marked on the invoice was $791,620.03.

All of Defendant's machinations culminated on April 29, 2008, when the $15.2 million loan to Bluejay closed and UNB paid the $2,417,782.15 first draw of the loan. As Fagan, Duncan, Larkin and Oehlert testified, the transactions leading up to this closing were carefully planned and executed by Defendant. And although Fagan and Defendant had developed a protocol for how Fagan would have a construction superintendent prepare a draw request and then Fagan would rely on an independent expert to evaluate the request, Defendant did not involve Fagan in this first $2.4 million draw. Fagan testified that instead Defendant organized the mechanics and logistics of the money for the first draw. Just as Defendant had carefully planned and executed the transactions leading up to the closing of the loan, he had carefully planned and executed the transactions that had to occur upon the closing of the loan. Even Defendant acknowledged in his deposition testimony that

> when we closed on the Bluejay loan and on the first draw, that had to all happen simultaneously because money that was being advanced on the loan on the first draw was going to Big D Construction for their construction draw, and, then, they were paying out various suppliers or people reimbursing them. And part of the funds were going to Schmidt Builders, and, then, John Duncan was borrowing the money from Schmidt Builders and he was using the funds from there for the initial equity to put into the Bluejay loan.

Back on April 17, Defendant sent Duncan an email[40] directing Duncan to write four checks: (1) $350,000 that would be used to pay down a $650,000 UNB loan to Duncan; (2) $750,000 that would be used to purchase a $750,000 CD to be pledged as additional collateral on a UNB $1.5 million loan to Duncan;[41] (3) $250,000 to pay a UNB mortgage on Quinton Point land; and (4) $19,975 to apply to the balance due on the $402,000 loan from Stonehouse Rentals. Defendant advised Duncan that Defendant would have a check for Duncan in the amount of $1.35 million out of the first draw of the Bluejay loan.  Duncan testified that after he wrote these checks,[42] Defendant put them in a drawer in Defendant's UNB office, which Duncan recognized as highly unusual.  Defendant held these checks until the Bluejay loan closed, and these checks were part of Defendant's carefully planned execution of disbursements from the first draw of the Bluejay loan.  On April 29 UNB wired $1.225 million to Schmidt Builder Supply's account, Larkin wired $250,000, and Defendant negotiated these four checks.  The following day, April 30, Duncan tendered a $750,000 check to UNB for an additional CD.

The victim banks testified that they felt deceived by the omission about the financial problems of the borrowers and guarantors and related business entities.  In the Offering package, which included the UNB Loan Application/Purpose Statement, financial statements provided by UNB and other information from UNB that BBOK provided in its Loan Summary Narrative, there was no information about the borrowers and guarantors overdrawn UNB bank accounts, dozens of past due loans that were repeatedly renewed or extended, nor the loans UNB made to them or nominees to make interest payments on some of these loans.  There was no information

---

[40] Ex. 241.

[41] Also, $250,000 would be used to fund the CD from the $250,000 Larkin remitted to Duncan after UNB's March 28, 2008 nominee loan of $500,000 to Larkin.

[42] Exs. 31 and 32.

that the liens on the land were to be paid out of Bluejay loan proceeds, rather than the borrowers infusing the project with unencumbered land.  There was no information that the $1.3 million in lumber that was supposedly prepaid and earmarked for the project was in fact not prepaid or earmarked.  There was no information that the $1.5 million CD purportedly from John Duncan and the $205,000 CD purportedly from Big D Development were also not an infusion of cash or equity by the borrowers but were funded by UNB loans or the proceeds of the Bluejay loan.  Nor was there information disclosed that Duncan's liabilities to UNB were understated by $1.9 million.  The victim banks testified that all of these undisclosed facts were material to their decision, and they would not have agreed to participate in the loan had this information been disclosed to them.

The evidence was that this information was known and/or accessible to Defendant.  The accounting details of the loans or bank accounts were accessible to Defendant through UNB records, albeit not in the summary fashion presented by the investigating agent.  But the agent had to compile information about these borrowers, who were otherwise unknown to him, solely by culling through the UNB records.  In contrast, Defendant continually monitored the financial condition of the borrowers in real time. Moreover, in his deposition testimony, Defendant testified that as a loan officer, in evaluating whether to participate in a loan, he would want information about: the originating bank's history with the borrower, whether the borrower paid their loans on time or were the loans past due, and whether the borrower had good cash flow and ability to repay their loans.  But Defendant either omitted this type of information or did not truthfully disclose it in the Offering package to participant banks.

### 1.    Bank Fraud (Counts 2–5)

Defendant was convicted of three counts of bank fraud in violation of 18 U.S.C. §§ 1344(1) and (2).  The elements of the crime of bank fraud in violation of 18 U.S.C. § 1344(1) are: (1) the defendant knowingly executed a scheme or artifice to defraud a bank, as alleged in the Indictment; (2) the bank was a financial institution within the meaning of the law, that is insured by the Federal Deposit Insurance Corporation; (3) the defendant acted with intent to defraud; (4) the defendant made false or fraudulent pretenses, representations, or promises that were material, meaning they would naturally tend to influence, or were capable of influencing the decision of a bank; and (5) the defendant placed the bank at risk of civil liability or financial loss.[43]

The elements of the crime of bank fraud in violation of 18 U.S.C. § 1344(2) are: (1) the defendant knowingly executed a scheme or artifice to obtain money or property owned by or under the custody or control of the bank, as alleged in the Indictment, by means of false or fraudulent pretenses, representations, or promises; (2) the bank was a financial institution within the meaning of the law, that is insured by the Federal Deposit Insurance Corporation; and (3) the defendant made false or fraudulent pretenses, representations, or promises that were material, meaning they would naturally tend to influence, or were capable of influencing the decision of the financial institution.[44]  Further, the omission of material facts can effect a misrepresentation.[45]  And Defendant was further charged and convicted of  18 U.S.C. § 2 with respect to Counts 2–5.  Aiding and abetting is defined as

whoever commits an offense against the United States or aid, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

---

[43] Doc. 131 (Jury Instruction 25).

[44] *Id.* (Jury Instruction 26).

[45] *See United States v. Curtis*, 537 F.2d 1091, 1097, (10th Cir. 1976); *Williams v. United States*, 368 F.2d 972, 975 (10th Cir. 1966).

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.[46]

Defendant argues that the government failed to prove beyond a reasonable doubt that he made false, material representations, that he acted with intent to defraud, and that he knowingly executed a scheme to defraud the participant banks.  Defendant first argues that because he did not communicate with the participant banks, there was no evidence he made false representations to the banks at all.  To be sure, the evidence was that Craig Ellis, the Vice President of BBOK and perhaps other BBOK personnel had direct written and perhaps oral communications with the participant banks, while Defendant and other UNB personnel had no oral communications with the participant banks.  But UNB directly communicated with the banks through BBOK's March 21, 2008 Offering[47] and accompanying Offering package dated January 12, 2008[48] that was distributed to all potential participant banks.  This Offering package included UNB's December 5, 2007 Loan Application/Purpose Statement that included many representations about the borrowers, guarantors and construction project.  Moreover, BBOK's own Loan Summary and Narrative included information about the borrowers and guarantors that came from UNB.  By submitting UNB's Loan Application/Purpose Statement with information from UNB's records and from Defendant's knowledge of the borrowers, and by providing other information used in BBOK's Loan Summary and Narrative, Defendant caused this information to be included in BBOK's Offering package, and thus aided and abetted the communication of false representations and false pretenses (based on material information omitted by UNB) to the victim banks.

---

[46] Doc. 131 (Jury Instruction 31).

[47] Ex. 153.

[48] Ex. 153-A.

Furthermore, Defendant's argument that there was no evidence that it was he who communicated with Ellis or anyone at BBOK is of no avail.  Bartlow and Scott testified that they had no communications with BBOK before BBOK approved the loan, and that although Bartlow drafted the Loan Application/Purpose Statement, it was Defendant who directed, reviewed, evaluated and approved it.  Moreover, Bartlow and Scott had no banking relationship with the borrowers.  Defendant, who served as loan officer on almost of UNB's loans to the borrowers, guarantors, and related business entities, had such a relationship.

As Scott testified, Defendant was always involved with the loans in his portfolio, but he was even more involved in the Bluejay loan.  Other evidence certainly bears that out.  Defendant communicated with Fagan weekly and sometimes daily about the status of these many past due loans.  Defendant discussed with the borrowers the source of their payments on loans in the infrequent times when they made payments.

Furthermore, an email from Ellis indicated that he and Defendant had discussed BBOK's Offering.  No other BBOK or UNB personnel involved communicated about the substance of information in the Offering.  A reasonable jury could infer that Ellis and Defendant had spoken, based on information in the Offering that had to come from Defendant given his knowledge of the borrowers as their loan officer.  Moreover, in his deposition testimony, Defendant acknowledged that Ellis required that Big D pay down its debt before the Bluejay loan closed, thus indicating that he had communicated with Ellis.  And in an April 23 email,[49] Defendant represented to Ellis that he had inventoried the lumber.  All of this proved that Defendant did in fact communicate with Ellis.  In short, the evidence proved beyond a reasonable doubt that the Offering included representations made by Defendant, in the form of the Loan

---

[49] Ex. 253.

Application/Purpose Statement and in the form of representations that Ellis relied upon in drafting BBOK's Loan Summary and Narrative.  Defendant made false representations in written form to the victim banks.

Moreover, given Defendant's deep involvement in the Bluejay loan and the loans to the borrowers, guarantors and related entities that preceded the Bluejay loan, the evidence proved beyond a reasonable doubt that Defendant knew that certain representations were false, including that the Bluejay borrowers had financial strength.  On the contrary, they were in terrible financial condition according to Fagan and Duncan, who testified that he was insolvent.  Defendant knew these borrowers, and knew that absent UNB loans to them or nominees, they could not service their monthly interest payments on loans preceding Bluejay.  UNB had to loan Freeman and Duncan $35,000 and $55,000 to Skepnek and Fagan to make interest payments.  Defendant knew they could not pay off the mortgages on the Quinton Property land.  Defendant knew that Duncan had not prepaid for $1.3 million in lumber and infused that into the project.  Defendant knew that they did not have the money to fund a $205,000 or a $1.5 million CD.  Thus, Defendant knowingly falsely represented that the borrowers had financial strength.

Defendant further argues that there was insufficient evidence that Defendant acted with intent to defraud and no evidence that he concocted a "scheme."  But in fact, Duncan testified expressly that Defendant created this "scheme."  Defendant argues that Duncan is not credible, a convicted felon for bank fraud and money laundering, and years ago for securities fraud.  But a reasonable jury could find Duncan's testimony credible, particularly because it was roundly corroborated by UNB bank records and the testimony of Fagan, Oehlert, Salah Ibrahim, John Larkin, and Michael McKinley.  Furthermore, a reasonable jury could find that Defendant's

careful planning and execution of transactions preceding the closing of the Bluejay loan and transactions and disbursements upon the funding of the Bluejay loan was a "scheme."

### 2. False Statement in Bank Records (Counts 6–7)

Defendant was convicted of Count 6, making a false entry in UNB records, to wit: the April 11, 2008 $205,000 security agreement of Big D Development.  Defendant was also convicted of Count 7, making a false entry in UNB records, to wit: the April 11, 2008 $1.5 million security agreement of John W. Duncan, Jr.

The elements of the crime of false entry in bank records in violation of 18 U.S.C. § 1005 are: (1) UNB was a federally insured bank; (2) the defendant made a false entry in a record of UNB as alleged in the indictment; (3) the defendant knew the entry was false when he made it; and (4) the defendant made the false entry with the intent to defraud the victim banks identified in the Indictment.[50]

Defendant argues that the evidence was insufficient to support the convictions on Counts 6 and 7 because the evidence failed to prove beyond a reasonable doubt that Defendant made a false statement in the security agreements.  Defendant argues that the security agreements were not false in referencing the two CDs because the plain language of the security agreements provided that the security interest may include presently existing or future collateral.  But these two security agreements,[51] which contain identical language, do not state that.  What Defendant is referring to is language under the "Obligations" section of the security agreements which states in pertinent part:

> Obligations.  The collateral shall secure the payments and performance of all of Borrower's and Owner's present and future, joint and/or several, direct and indirect,

---

[50] Doc. 131 (Jury Instructions 27 and 28).

[51] Ex. 16 (Commercial Security Agreement of Big D Development for $205,000 CD); Ex. 17 (Commercial Security Agreement of John W. Duncan, Jr. for $1,500,000).

absolute and contingent, express and implied indebtedness to Lender under any promissory note or agreement described below, including all future advances made by Lender to Borrower or Owner…

This standard clause, often referred to as a future advance clause, states that the collateral shall secure future loans or advances by UNB. It does not provide that the collateral that is specifically described in the security agreement may be inexistent at the time of the security agreement. On the contrary, these security agreements state that the collateral is "[a]ll deposit accounts including, but not limited to, any deposit accounts described on Schedule A, attached hereto and incorporated herein by this reference;" Attached to the Big D Development security agreement is Schedule A describing the collateral as "CD# 0170064751 in the amount of $205,000.00 issued by Lender maturing 10/11/09."[52] And attached to the John W. Duncan, Jr. security agreement is Schedule A describing the collateral as "CD# 0170064778 in the amount of $1,500,000.00 issued by Lender maturing 10/11/09."[53]

The plain language of the security agreements and the attached schedule of collateral stated that the CDs existed as of the date of the security agreements, April 11, 2008. The CDs had an assigned account number and the schedules stated that the Lender had "issued" the CDs, not that the Lender *will* issue the CDs at a later date. But in fact, as Defendant acknowledges in his motion for judgment of acquittal, these CDs were not opened or funded until April 28, 2008. By signing these two security agreements, both records of UNB, Defendant entered false bank records stating that UNB had issued these CDs on or before April 11, 2008.

Further, when viewed in the light most favorable to the government, the evidence proved beyond a reasonable doubt that Defendant knew that the CDs had not been "issued," opened or

---

[52] Ex. 16.

[53] Ex. 17.

funded at the time he signed the security agreements on April 11, 2008.  Defendant admitted as

much when he testified in his deposition that he knew on April 17, 2008 the CDs were not

opened or funded.[54]  Kaye Finn, the banking expert, testified that a CD is a certification that a

certain amount of money is deposited in the bank, and there is no such thing as an unfunded CD.

Blake Heid, president of one of the victim banks, testified that a CD means you have money on

deposit; if you do not, it is a fake document and fraud.  Heid, as well as David Brownback and

Donald Whelchel, presidents of other victim banks, testified that their banks would not have

agreed to participate in the loan had they known on April 11 these so-called CDs were not

funded.

Moreover, when viewed in the light most favorable to the government, the evidence

proved beyond a reasonable doubt that Defendant made these false entries into UNB's records

with the intent to defraud the participant banks into participating in the loan.  First, the concept

of an unopened, unfunded CD is so foreign to banking and even common experience, that using

that as a guise or excuse for listing these CDs as collateral on April 11 is itself circumstantial

evidence of fraudulent intent.  Catherine Gaines, then Credit Administration Manager of BBOK,

and Patrick Walsh, president of one of the victim banks, both testified that based on the security

agreements, they expected that the CDs existed on April 11, and would have felt deceived to

learn they were not open and funded on or before April 11.

Defendant engaged in further subterfuge that evidenced his fraudulent intent.  He not

only signed the two security agreements dated April 11, 2008.  On the Big D Development

security agreement he had the members of Bluejay LLC and Big D Development sign a

---

[54] Ex. 445-D, Transcript of Gregory Deposition at 454:14–21, *UNB v. JMD, LLC, et al.*, (2016) (Case No. 2011CV560); Doc. 152-2, at 8.

"Collateral Receipt" dated April 11 signifying that "Owner delivers to Lender as collateral to secure the Obligations of Borrower or Owner to Lender the following described property: CD# 0170064751 in the amount of $205,000.00 issued by Lender maturing 10/11/09."[55]  And Defendant had Duncan sign a "Collateral Receipt" dated April 11 signifying Duncan's delivery to UNB of the $1,500,000 CD.[56]  These collateral receipts were additional false statements that the CDs were delivered to UNB on April 11, though in reality the CDs did not exist at that time.

As set out more fully in the prior section of this order, viewed in the light most favorable to the government there was evidence beyond a reasonable doubt that Defendant acted with the intent to defraud the banks in connection with the participation loan, which included his entry of these security agreements that falsely represented there were CDs on deposit with UNB on April 11.  This was but one action Defendant engaged in that was circumstantial evidence of his intent to defraud.  There were Defendant's false representations that the Bluejay members or guarantors contributed equity to the project when in fact the CDs did not exist.  There was his false representation that the borrowers were providing equity in the form of unencumbered land, when in fact the land was encumbered and brought free and clear with funds from UNB loans to the borrowers, their nominees and the proceeds of the Bluejay loan itself.  This so-called equity was a mirage, not sourced from the borrowers or guarantors' assets, but from a web of undisclosed loans that preceded the closing of the Bluejay loan, and/or from disbursements of the Bluejay loan.  Despite Defendant's involvement in this web of loans involving the Bluejay members or guarantors, much of which happened in the 60 days preceding the closing of the Bluejay loan, Defendant never disclosed to the banks that the borrowers' debt obligations had grown higher

---

[55] Ex. 16.

[56] Ex. 17.

than what was disclosed in the Offering.  The failure to disclose was further evidence of fraudulent intent.

There was substantial evidence that Defendant schemed, orchestrated and managed the Bluejay loan in a manner meant to defraud the banks into thinking that these borrowers and guarantors had "skin in the game," from unencumbered assets that they owned that served as the borrowers' fifteen percent equity or served as collateral for the loan.  The fifteen percent was purportedly comprised of the borrowers' assets: the $1,500,000 CD; the $205,000 CD; and unencumbered land valued at $575,000.  But in reality, it was comprised of the proceeds of undisclosed UNB loans to the borrowers, guarantors, their related entities and/or their nominees, as well as from the Bluejay loan itself.

Defendant was the loan officer for all of the UNB loans involving the Bluejay members, and their related entities except for the $402,000 loan to Duncan.  As their loan officer, Defendant devised a complicated series of transactions involving loans, assumption of loans, false invoices, and a false lumber inspection, all with the intent to conceal that the collateral for the Bluejay loan was either paid for out of the Bluejay loan proceeds, or from UNB loans to Bluejay members, guarantors, related entities, or nominees.  This scheme could only work if it was sequenced in exactly the order devised by Defendant, as he acknowledged in his deposition testimony:

> So prior to the loan closing, I knew that the capital was going to come from the loans to Mr. Duncan and the loans to Mr. Larkin was part of that.[57]

---

[57] Ex. 445-B, Transcript of Gregory Deposition at 156:17–20, *UNB v. JMD, LLC, et al.*, (2016) (Case No. 2011CV560); Doc. 152-2.

> Well, there was conversations that Luke (Oehlert) was going to loan the Big D guys money to pay for the liens and closing costs that were going to be associated with the loan.[58]
>
> . . . when we closed on the Bluejay loan and on the first draw, that had to all happen simultaneously, because money that was being advance on the loan on the first draw was going to Big D Construction for their construction draw, and, then, they were paying out various suppliers or people reimbursing them.  And part of the funds were going to Schmidt Builders, and, then, John Duncan was borrowing the money from Schmidt Builders and he was using the funds from there for the initial equity to put into the Bluejay loan.[59]

Much of this carefully planned and sequenced activity is documented in various UNB journal vouchers, many of which—Rhonda Scott testified—were written in Defendant's handwriting. Scott further testified that at some point during 2008, while the OCC was at UNB conducting an audit, Defendant told her to remove one or two dozen documents from Freeman's loan files, something no one had ever requested her to do.  From this, a reasonable jury could infer fraudulent intent.

Finally, there was circumstantial evidence of Defendant's intent to defraud in regard to the disbursements from the Bluejay loan.  Upon closing, the $2,417,782.15 first draw of the loan went to: Big D ($243,252.99), Larkin ($698,424.95) and Schmidt Builder Supply ($1,225,000).  These disbursements were not just for construction and related costs.  Rather some of the first draw went to partially or fully pay past due loans to Bluejay members or guarantors, or a nominee loan that was undisclosed to the banks.  These disbursements were also used to pay off certain loans and liens of Freeman, Duncan, Big D Development and related entities that

---

[58] Ex. 444-O, Transcript of Gregory Deposition at 241:10–13, *UNB v. Stephen Oehlert, et al.*, (2010) (Case No. 2009CV174); Doc. 152-1.

[59] Ex. 445-J, Transcript of Gregory Deposition at 455:20 to 456:5, *UNB v. JMD, LLC, et al.*, (2016) (Case No. 2011CV560).

preexisted the Bluejay loan.  And some of the first draw went to cover overdrafts in Big D's UNB bank account.

Freeman received $243,252.99 which was split into three parts: (1) $116,230.75 was used to make loan payments, pay off a past due loan and fund the $205,000 CD; (2) $96,845.90 was used to pay off the Stonehouse Rentals lien on the Quinton Point property; and (3) $30,176.34 was used to bring current one overdrawn Big D checking account.

Larkin received $698,424.95.  From this, Larkin disbursed $250,000 to Duncan to effectuate UNB's nominee loan for the benefit of Duncan.

Duncan received $1,225,000 from the first draw plus $250,000 from Larkin.  This total of $1,475,000 covered the four checks Defendant had directed Duncan to write on April 11. Defendant kept these four checks in his drawer until the loan closed and the first draw simultaneously was disbursed, pursuant to his carefully sequenced plan.

This scheme accomplished three purposes: (1) it deceived the banks into thinking that the Bluejay members and guarantors had contributed equity to the project, so-called "skin in the game;" (2) it covered Defendant's concealment of the materially adverse loan and credit history of these same borrowers and guarantors, with their numerous past due loans, repeated extensions and renewals with virtually no payment of interest, much less reduction of principal; and (3) it brought current most if not all of UNB's loans to Big D, Freeman, Duncan, Fagan, and Skepnek that comprised Defendant's loan-officer portfolio.

The Court thus finds that Defendant has not shown any basis for it to grant a judgment of acquittal on Counts 2–7.  That aspect of his motion is denied.

## II.    Motion for New Trial

Defendant also moves for a new trial pursuant to Rule 33(a), which allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires."[60] "The burden of demonstrating prejudicial error is on the defendant, and new trials should not be granted if a defendant's substantial rights have not been affected."[61] "Additionally, any error that would require reversal may justify a new trial."[62] "The court may weigh the evidence and assess witness credibility."[63] A new trial is warranted if, after weighing the evidence and the credibility of the witnesses, the Court determines that "the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred."[64]

Defendant presents four grounds upon which he claims the interests of justice require the Court to grant him a new trial. The Court addresses each in turn.

### A.        Admission of Government's Rule 1006 Summaries

Defendant argues that a new trial is warranted based on the erroneous admission of the government's summaries which were admitted under Fed. R. Evid. 1006. These summaries, prepared by Special Agent Shawn Nickell and reviewed for accuracy by the prosecutors, comprised Exhibits 601, 603–617 and 619–620. These exhibits summarized: (1) Bluejay Members' Past Due Loan Balances July 2007 to April 2008;[65] (2) Bluejay Borrowers Delinquencies of 60 Days of More on UNB Loans;[66] (3) Bluejay Members' Past Due Loans

---

[60]Fed. R. Crim. P. 33(a).

[61] *United States v. Yoakam*, 168 F.R.D. 41, 44 (D. Kan. 1996).

[62] *Id.*

[63] *Id*.

[64] *United States v. Evans*, 42 F.3d 586, 593–94 (10th Cir. 1994) (recognizing that this power "should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.").

[65] Ex. 601.

[66] Ex. 603.

During the Bluejay Loan Approval Process;[67] (4) Loans to Bluejay Members Extended/Renewed

at Maturity—July 2007 to April 2008;[68] (5) Monthly Matured Loans & Source of Payment;[69] (6)

Monthly Matured Loans & Source of Payment August 2007 through April 2008;[70] (7) Bluejay

Members' Loans that Matured During the Bluejay Loan Process;[71] (8) Bluejay Members'

Matured (Extensions/Renewals) UNB Loans;[72] (9) Bluejay Members Named on

Loan(s)/Guarantor(s) at University National Bank;[73] and Bluejay Members' UNB Debt from

March 21, 2008 to April 14, 2008.[74]

    Fed. R. Evid. 1006 allows the admission of summaries, charts, or calculations to prove

the content of voluminous writings that cannot be conveniently examined in court, so long as the

proponent has made the original or duplicates available for examination and/or copying by other

parties at a reasonable time and place.[75]

    In *United States v. Renteria*,[76] the Tenth Circuit offered guidance to trial courts in

considering this type of evidence, directing that the court first determine whether the summary

aids the jury in ascertaining the truth, considering the length of the trial, the complexity of the

case and the volume of exhibits.  Further, the court should determine whether the summaries

---

[67] Ex. 604.

[68] Ex. 605.

[69] Ex. 606.

[70] Exs. 607–615.

[71] Ex. 616

[72] Ex. 617

[73] Ex. 619.

[74] Ex. 620.

[75] It is undisputed that the government provided the underlying documents to Defendant for the requisite examination and/or copying at a reasonable time and place.

[76] 720 F.3d 1245, 1253 (10th Cir. 2013).

could result in prejudice, considering whether the preparer is available for cross examination and whether the court gave the jury a limiting instruction.[77]

This Court is satisfied that the *Renteria* factors establish that the summaries were properly admitted in this case. These summaries were based on extensive review of documents in UNB's customer and loan files, all of which were accessible to Defendant, as a senior loan officer at UNB and as the loan officer on almost all of these loans. Special Agent Nickell testified that he reviewed UNB customer and loan files for the members of Bluejay and the guarantors on the Bluejay loan, including Big D Development, Big D Construction, John and Mary Duncan, David and Kathleen Freeman, William and Susan Skepnek, John and Deanna Larkin and Brennan Fagan. He also reviewed customer and loan files for other entities associated with one or more of these individuals, including L&K Trucking, Planet Development, Planet Construction, Quinton Properties, and DT&E Properties.

Although Agent Nickell decided to narrow his review to UNB customer and loan files for the ten-month period preceding the closing of the Bluejay loan in April 2008, the files included 69 loans that Agent Nickell grouped into 56 loan groups that comprised thousands of pages of documents. The documents included commercial fixed rate notes and supporting documents, renewals, extensions, paid note statements, past due notices, disbursements, FiServ screenshots and journal vouchers. Agent Nickell testified that it took him months to review these files, which were too voluminous to be easily examined in court. Thus, he prepared summary charts of the various borrowers' loan history including maturity dates and balances, renewals and extensions, and past due dates and amounts, during the months preceding the Bluejay loan,

---

[77] *Id.*

including the critical periods when the participation was offered and pending, and during the time period in April 2008 surrounding the closing and funding of the loan.

Given the nature of the summaries, the great volume of UNB records they summarized and the relevance of the borrowers' and guarantors' loan and credit history, these summaries were of great assistance to the jury, and highly probative in ascertaining whether Defendant falsely represented or fraudulently concealed or omitted material information about the financial strength of the borrowers and guarantors.  This was a case of some complexity, charging Defendant with conspiracy to commit bank fraud, false statements in bank records, and bank fraud, under two sections of 18 U.S.C. § 1344.  Despite the summaries, there were hundreds of other exhibits admitted into evidence and the jury heard testimony from 16 witnesses.

Nonetheless, Defendant claims that admission of these summaries was prejudicial to him because the summaries did not explain why the loans were renewed or extended, how long certain payments were past due and whether in fact these loans were delinquent.  But these were questions Defendant was able to ask, and did ask, of Agent Nickell who reviewed the underlying records and prepared the summaries.  Agent Nickell responded to vigorous cross-examination about the very issues Defendant now raises.  Defendant also complains that these summaries were improperly prepared and were manipulated by the government because the prosecutors were too involved in their creation, rather than the investigating agent.[78]  But the Court credits Agent Nickell's testimony that he created and prepared the charts, not the prosecutors; and that the prosecutors merely checked the summaries for accuracy but did not direct their substance.

---

[78] *See United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997) (explaining that Rule 1006 summaries are to be prepared by a witness available for cross-examination, not by the lawyers trying the case.).

Further, although Defendant did not request a limiting instruction at the time these summaries were admitted, at the close of the case, Judge Murguia instructed the jury, based on the Tenth Circuit's pattern instructions: "[c]ertain demonstrative charts have been shown to you to help explain the evidence in this case.  Their only purpose is to help explain the evidence. Certain summaries have been introduced as evidence and may be considered just as other evidence."[79]  The Court thus insured that this evidence was not given any more weight than any other evidence in the case.

In short, the government met all the foundational requirements of Fed. R. Evid. 1006, and established that these summaries were probative and not unfairly prejudicial.  Further, Defendant utilized vigorous cross-examination to test the information and import of the compilations in these summaries.  The Court did not abuse its discretion in admitting these summaries.[80]

### B.      Failure to Admit Chalmers Memorandum

Defendant argues that a new trial is warranted based on Judge Murguia's failure to admit Exhibit 2000, referred to as the "Chalmers Memorandum."[81] The memorandum was written by Arthur Chalmers, legal counsel for BBOK, regarding whether BBOK and the participant banks had a viable legal claim against UNB arising out of Bluejay's default on the participation loan. Mr. Chalmers opined, inter alia, that: "the totality of the evidence collected in the Bluejay litigation does not support that BBOK could have successfully pursued UNB for reimbursement of its losses incurred from Bluejay's default on the participated loan;" and "[w]e don't believe the evidence shows BBOK or its subparticipants were defrauded."

---

[79] Tr. 1794; Tenth Cir. Cr. Pattern Jury Instruction § 1.41 at 62 (2011 ed. Updated Feb. 2018).

[80] *United States v. Carranco*, 551 F.2d 1197, 1199–2000 (10th Cir. 1977) (the determination of the adequacy of the foundation for the admission of evidence, and the admission or rejection of evidence, is left to the sound discretion of the trial court).

[81] Doc. 150-1.

The government objected to admission of the Chalmers Memorandum on four grounds: lack of relevance under Fed. R. Evid. 401, lack of sufficient foundation or indicia of trustworthiness to qualify as a business record under Fed. R. Evid. 803(6), hearsay within hearsay under Fed. R. Evid. 805, and that its admission would be more prejudicial than probative under F.R.E. 403.  Defendant proffered the Chalmers Memorandum through the testimony of David Brownback, CEO of Citizens State Bank & Trust, who had received the memorandum from BBOK.  Judge Murguia sustained the government's objection under Fed. R. Evid. 401 and Fed. R. Evid. 403; he did not rule on the government's hearsay objections.

Under Fed. R. Evid. 401, evidence is relevant "if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[82]  Defendant argues that the Chalmers Memorandum was relevant because it "provides analysis of whether any wrongdoing occurred on the part of UNB (and, by extension, Mr. Gregory) in relation to the Bluejay loan.  Among other things, the Chalmers Memorandum expresses great skepticism that the banks were defrauded or that any material misrepresentations were made."

But, as the government posits, the Chalmers Memorandum is a legal opinion regarding UNB's civil liability to BBOK and participant banks in the aftermath of Bluejay's default on the participation loan.  It is not evidence of the existence of any fact, other than that Mr. Chalmers, based on an unknown and mostly unspecified quantum of facts, opined that UNB had not defrauded BBOK and the participant banks.  The Chalmers Memorandum has no relevance as to whether Defendant in fact made false representations or otherwise committed fraud, and no

---

[82] *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006) (quoting Fed. R. Evid. 401). "Rule 401 is a liberal standard" and "establishes only a minimal level of probability—the evidence must render the asserted fact of consequence more probable than it would be without the evidence." *Id.*

relevance as to whether Defendant's representations were material.  It is merely a legal opinion, offered by someone evaluating the potential of civil liability for fraud and breach of contract.[83]

And, whether BBOK and the participant banks ultimately sued or reached a settlement with UNB is simply of no consequence.  Although one of the elements of 18 U.S.C.§ 1344(1) is that the defendant placed the bank at risk of civil liability or financial loss, it is immaterial that UNB was not sued.  For here, the government presented substantial evidence that the banks were placed at risk of financial loss at the time of the Bluejay loan.  This risk flowed from Defendant's actions in concealing the adverse loan and credit history of the principals of Bluejay and the guarantors on the loan, and Defendant's false representation that the borrower's principals and the guarantors had infused equity into the loan in the form of CDs, unencumbered land, and prepaid, unencumbered lumber.

Moreover, the Chalmers Memorandum was not relevant as impeachment evidence. Defendant offered the memorandum during his cross-examination of Mr. Brownback but did not argue that it was offered to impeach the testimony of Brownback.[84]

The Chalmers Memorandum was not only not relevant, it was properly excluded under Fed. R. Evid. 403, because its prejudicial effect far outweighed any probative value.  Under Rule 403, evidence is excluded if the Court determines that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

---

[83] Exhibit 55 is the Participation Agreement entered into by UNB and BBOK which includes a paragraph in which UNB, as the originating bank disclaims any liability to BBOK with respect to its credit underwriting of this loan, other than the duty of "ordinary care."

[84] While the government obtained this memorandum during its investigation, Defendant did not list the Chalmers Memorandum as a trial exhibit but sought its admission during cross-examination of government witness David Brownback.

evidence."[85]  The prejudicial effect of the Chalmers Memorandum was substantial.  It constituted

a legal opinion by an attorney, Arthur Chalmers, who was not called to testify as an expert or a

lay witness, such that the government would have had no ability to cross examine Chalmers

about the facts he relied upon or the basis for his opinions.  In the memorandum, Chalmers

asserted that his opinion was based "on the totality of the evidence collected in the Bluejay

litigation,"[86] without specifying what that totality of the evidence entailed.  While an opinion by

a lay witness may be admissible under Fed. R. Evid. 701, or an opinion of a properly qualified

expert witness may be admissible under Fed. R. Evid. 702, the legal opinions in the Chalmers

Memorandum were not offered through the testimony of Mr. Chalmers.  As troubling, contrary

to the strictures in Fed. R. Evid. 704, the legal opinions in the Chalmers Memorandum went to

the ultimate issues in this case, to wit: did Defendant defraud the banks.

Further, admission of the Chalmers Memorandum would have confused the issues.  The

Chalmers Memorandum opined about UNB's liability to BBOK and the banks on potential

claims of civil fraud and breach of contract.  The elements of such civil causes of action differ

from the elements of the crimes charged in this case.  Further the Chalmers Memorandum

discussed findings made by a judge in a civil action styled *University National Bank v. JMD, et

al. v. Kaw Valley Bank v. Bankers' Bank of Kansas, et al.*, filed in Douglas County Kansas

District Court.  This would import still more confusion into this case, through Chalmers'

assertions as to the substance of a judge's summary judgment ruling in a civil action involving a

number of other parties.

---

[85] Fed. R. Evid. 403.

[86] Doc. 150-1.

Moreover, introduction of the Chalmers Memorandum would have also confused and misled the jury with Chalmers' assertions of facts, without any indication of whether he had personal knowledge of these facts nor any explanation for the basis of his assertions of fact.  For example, Chalmers asserted that "KVB and its attorneys have been the sponsors of the fraud allegations involving the Bluejay loan."  Furthermore, some of the facts he asserted were contrary to the evidence presented to the jury in this case, which would have led to confusion, particularly when the government could not cross-examine Chalmers about the basis or credibility of his factual assertions.  For example, Chalmers asserted that "the CDs pledged as collateral for the Bluejay loan were in place and fully funded *before* the Bluejay loans was finalized, i.e., any money was released on the loan."[87]  This was of course contrary to the evidence presented in this case; multiple witnesses and multiple documents evidenced that the CDs pledged as collateral were not in place nor fully funded until the Bluejay loan was funded until April 28.

While the government objected that Defendant failed to lay sufficient foundation for admission of the Chalmers Memorandum as a business record under Fed. R. Evid. 803(6), and that the memorandum was replete with hearsay within hearsay and thus inadmissible under Fed. R. Evid. 805, Judge Murguia excluded the Chalmers Memorandum on other grounds.  This Court thus need not discuss Defendant's argument that the memorandum was admissible as a business record.  Even if this memorandum was a business record of Mr. Brownback's bank, it was inadmissible under Fed. R. Evid. 401 and Fed. R. Evid. 403.

### C.      Government's Closing Argument

---

[87] *Id.*

Defendant argues that the government's closing argument constituted prosecutorial misconduct warranting a new trial because: (1) the government fabricated evidence; (2) the government essentially called Defendant a liar; and (3) the government repeatedly misstated the evidence.  The Court addresses each in turn.

Defendant argues that the government fabricated evidence in its use of a hypothetical, that the government counters was a rhetorical device clearly presented to the jury as a hypothetical.  The government asked the jury to imagine that all the bank presidents were in a boardroom, and that instead of relying on the paper documents provided to them, Defendant had the opportunity to pitch this loan to them directly before they signed the addendums agreeing to participate in the loan.[88]  The government then continued that the difference would be that Defendant would give a "truthful" pitch of the loan.[89]  The government stated that this hypothetical pitch would include truthful representations including "a few things I hid from you so far."[90]  The government's hypothetical pitch included representations that: (1) the Bluejay borrowers owed millions of dollars in other loans that were not spelled out in the Offering; (2) they owed millions of dollars more in liabilities they had guaranteed; (3) Freeman, Duncan, Skepnek, and Fagan had struggled for months to meet their debt obligations, and they along with Big D had millions of dollars of loans that had been past due every month for the past ten months; (4) Defendant had extended or renewed their loans 71 times in the last ten months to keep the loans from defaulting and/or being reported and in fact had to extend or renew every single loan because they did not have the money; (5) these borrowers did not have financial strength and were not good borrowers; (6) that the borrowers were so broke that UNB had to

---

[88] Tr. 1819–20.

[89] *Id.* at 1820–21.

[90] *Id.* at 1821–23.

loan them money directly or through nominees because Duncan's loans were near the legal

lending limit; (7) Larkin's loan to benefit Duncan was not included in the almost $2 million in

loans on Duncan's financial statement; (8) Defendant convinced Oehlert to assume a Big D loan

that was 104 days past due; (9) Defendant loaned Skepnek and Fagan $55,000 and Duncan and

Freeman $35,000 to make past due payments on loans; (10) Defendant needed to make these

loans to avoid losing his bonus, losing his job, coming to the attention of the bank regulators, and

having UNB take a big financial hit; (11) the borrowers' fifteen percent cash equity down

payment required by BBOK did not come from their own cash reserves or property; and (12) the

CDs, liens on land, and lumber were funded from the first draw of the Bluejay loan, all of which

meant there was less money to fund the construction of the apartment complex than what was

represented, jeopardizing the project.[91]

Defendant objected repeatedly throughout the course of this closing argument, calling the

argument imaginary, hypothetical, and not based on the evidence.[92] And Judge Murguia, while

overruling the objections, instructed the jury, reminding them that closing arguments are not

evidence, but argument as to what counsel wants the jury to construe from the evidence.

Moreover, Judge Murguia tailored the standard limiting instruction to this circumstance, in

which the prosecutor had told the jury to imagine the Defendant had made certain

representations,

> Again, jury members, something I mentioned at the beginning of the closing
> argument, and I'll repeat at this time is what the attorneys say not only at this point
> of our trial, but at any point, their comments or their statements or, in this case, their
> arguments is not evidence.  The evidence is only what was presented to you through
> the witnesses' testimony and the exhibits that were admitted or stipulations.  That's
> the evidence that you must make your decision on.  In regards to their closing
> arguments, closing arguments are there for the attorneys to argue in regards to what

---

[91] *Id.* at 1821–39.

[92] *See e.g.*, *id.* at 1820–22, 1825.

they believe the evidence has shown or in this case what counsel identified is as a contrast or analogy or hypothetical, what they believe in regards to that as it relates to the evidence.[93]

Defendant argues that the government's closing argument was fabricated, not based on evidence and constituted prosecutorial misconduct, citing *Whittenburg v. Werner Enterprises*,[94] in which the Tenth Circuit reversed and remanded for a new trial, finding the trial judge abused discretion in overruling objections to plaintiff counsel's pervasive and improper remarks during closing argument.[95]  In the closing argument, plaintiff counsel asked the jury to imagine that shortly after the plaintiff left his house the night of his vehicular accident with the defendant's truck, the defendant had delivered a letter to the plaintiff's children that described the defendant's actions the entire day leading up to the accident, their mistakes, negligence and violation of traffic laws.  The hypothetical letter went on to describe the plaintiff's pain and suffering in the immediate aftermath of the accident in graphic and grueling detail, and disparaged the defendant's lawyers and their alleged nefarious conduct.[96]

The Tenth Circuit found that the

permissible limits of closing argument were exceeded in this case in two principal ways.  First counsel referred extensively to evidence not in the trial record.  Second, without apparent provocation or basis in the record for doing so, counsel flooded his argument with abusive references to his opposing party and counsel.[97]

But this case is distinguishable from *Whittenburg* for several reasons.

First, in this case, government's counsel did not engage in abusive references to Defendant or his counsel, as counsel did in *Whittenburg*, devoting a quarter of the argument to

---

[93] *Id.* at 1830–31.

[94] 561 F.3d 1122 (10th Cir. 2009).

[95] *Id.* at 1124.

[96] *Id*. at 1125–27.

[97] *Id.* at 1128.

"vituperative attacks on defendants and their counsel—attacks that likewise had no basis in evidence adduced at trial."[98]  In *Whittenburg*, counsel unfairly attacked the defendant for defending the lawsuit.[99]

In contrast, here government counsel's argument was firmly rooted in the evidence, and in particular, in establishing what information Defendant fraudulently failed to disclose to the banks.  To be sure, government counsel argued that Defendant's motivation in orchestrating and managing the approval of the Bluejay loan was to rescue his "tanking" loan portfolio, which was jeopardizing his annual bonus, his job, and perhaps UNB itself, should the regulators learn of this.  But this was not a "vituperative attack" on Defendant or his counsel, as was done in *Whittenburg*.

Second, government counsel argued facts that *were* established by the evidence.  In contrast, counsel in *Whittenburg* fabricated content in the letter that was not based on evidence, including that the truck driver was inexperienced and too confused to read road signs and that her co-driver failed to properly supervise her.[100]  Here, government counsel did ask the jury to "imagine" a boardroom meeting with Defendant making direct representations to the banks, something that did not happen.  And government counsel asked the jury to imagine that the Defendant represented to the banks the true state of affairs of the borrowers, their transactions, their assets, their financial condition and the use of the Bluejay loan proceeds.  But in its closing argument, government counsel acknowledged that the closing argument was a hypothetical based on what Defendant did not say, but what Defendant *should have disclosed*.  Counsel did not try to mislead the jury that the hypothetical was based on representations that Defendant made;

---

[98] *Id.* at 1129.

[99] *Id.* at 1130.

[100] *Id.* at 1128.

indeed, the point was that Defendant failed to make truthful representations and failed to disclose material information.

Government counsel's hypothetical was an entirely proper way to present the evidence in the context of this case, in which Defendant was charged with bank fraud, by making false representations, but also by false pretenses, or misrepresentations through omission, that is, failure to disclose material facts. Defendant caused to be submitted to the banks a Loan Application/Purpose Statement that affirmatively represented the borrowers had financial strength, but misrepresented their true condition by omitting information about their current and past history of millions of dollars of loans with past due balances and repeated renewals and extensions because the borrowers had no means to make interest payments or service their current debt. Defendant caused to be submitted to the banks an Offering package that affirmatively represented that the borrowers were making a fifteen percent cash down payment, but misrepresented their true financial condition by omitting information that the lumber was not prepaid nor earmarked for the project, the $1.715 million in CDs was funded by undisclosed UNB loans and by the Bluejay loan, and that the land was brought free and clear before closing largely through UNB loan proceeds, not from the borrowers' assets.

In this case, through the use of the hypothetical-truthful pitch in the boardroom, government counsel illustrated to the jury the magnitude, significance and materiality of what Defendant fraudulently *failed to disclose*, in contrast to the false representations about the borrowers' cash down payment, collateral, and financial condition. To be sure, there was no evidence of a boardroom. There was no evidence that Defendant had direct communication with the banks. All of Defendant's representations were made in writing and as part of the BBOK Offering package. But government counsel did not mislead the jury by arguing that there was

such direct contact with the banks.  Instead, he used the rhetorical device of illustrating the contrast between what truthful and full disclosure would have been versus what representations Defendant made and what Defendant failed to disclose.

To be sure, government counsel argued certain things that were not directly proved by the evidence.  Counsel argued that Defendant's motivation in orchestrating and managing the approval of the Bluejay loan was to rescue his "tanking" loan portfolio, which was jeopardizing his annual bonus, his job, and perhaps UNB itself, should the regulators learn of this.  But a reasonable jury could infer all of that from the evidence that Defendant's loan portfolio was comprised of millions of dollars of loans to the Bluejay principals, Big D and related entities— loans that were consistently in default from past due loan payments—because the borrowers did not have the financial means of making interest payments without additional UNB loans and/or repeated extensions and renewals.  The Bluejay borrowers were in an admitted tailspin, and they hoped the Bluejay loan would be their golden goose.  The jury heard sufficient evidence to infer that Defendant's orchestration of the Bluejay loan was motivated by his need to have his loan officer portfolio be rescued by the Bluejay loan, so much so, that he orchestrated using the Bluejay loan to fulfill the criteria for loan approval and using the loan proceeds to pay down other debts the borrowers owed to UNB.

A third factor distinguishes this case from *Whittenburg*.  Here, government counsel made no improper appeal to the jury's sympathy, as counsel did in *Whittenburg*, "plainly calculated to arouse its sympathy, evoking, as they did images of plaintiff's children receiving for the first time news of their father's injuries, implicitly asking the jury to place themselves in the shoes of the children and portraying Werner as repeatedly admitting to reckless conduct."[101]

---

[101] *Id.* at 1129.

Finally, unlike in *Whittenburg*, where "the district court declined to take any specific curative action,"[102] Judge Murguia gave a limiting instruction that the closing argument was not evidence, and specifically explained to the jury that counsel was presenting a hypothetical, analogy or contrast.[103]

Defendant also argues that reversal and a new trial is warranted because government counsel essentially called him a liar during the closing argument.  But the government did not call Defendant a liar.  At most, the government argued that the hypothetical was based on truthful information, in contrast to the Defendant's representations.  And, in presenting Defendant's hypothetical pitch in the boardroom, government counsel stated "[s]o I fibbed a bit when I told you that the borrowers had financial strength and also let BBOK echo that misrepresentation and led you to believe that they were good borrowers."[104]  But arguing that Defendant did not tell the truth is not the same as using the pejorative term of "liar." The Tenth Circuit has expressed concern over the specific use of the word liar.[105]  But in a bank fraud case, the government must prove and appropriately may argue or comment on a Defendant's false representations as well as deceitful statements, half-truths or concealment of material facts.

Finally, Defendant argues that a new trial is warranted because the government misstated the evidence in its closing argument.  Defendant essentially rehashes its arguments that there was insufficient evidence to sustain his convictions on Counts 2–7 of the Indictment because there was no evidence: (1) that Defendant hid or failed to disclose that the loan documents and addenda were not accurate; (2) that Defendant was aware of the representations in the Offering

---

[102] *Id.* at 1131.

[103] Tr. 1830–31.

[104] *Id.* at 1824.

[105] *See United States v. Orr*, 692 F.3d 1079, 1099 (10th Cir. 2012); *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1012–13 (10th Cir. 1999).

nor that he approved of it—in other words, no evidence that Defendant was involved in preparing UNB's Loan Application/Purpose Statement and no evidence that he communicated with BBOK or the banks; (3) of what Defendant knew about the financial condition of the Bluejay borrowers and guarantors; and (4) that the Bluejay loan was not a good loan.  The Court has thoroughly addressed the sufficient evidence on these points.

Two other arguments bear addressing, however.  First, Defendant argues that there was no evidence supporting the government's argument that the Quinton Point construction project was not sufficiently funded.  But this was a reasonable inference the jury could draw from evidence presented at trial.  The jury heard that the first draw of the Bluejay loan was $2.4 million and that $2,166,677.94 of the first draw went to Big D, Larkin, and Schmidt.  The jury heard that the approximate $448,000 that went to Larkin out of the first draw appeared to be for actual excavation work Larkin did on the Quinton Point Project.  But the $1,718,268.49 balance of the $2.1 million which went to Big D and Schmidt, was used to make the aforementioned loan payments, fund part of the CDs, pay off part of the land liens, and cover checking account overdrafts for Big D and others.  The jury could reasonably infer that the $15.2 million construction project was shorted because of the use of loan proceeds to pay for collateral, other debts, and overdrafts.

Second, Defendant argues that there was no evidence of the motive government counsel presented, that Defendant was at risk of losing his annual bonus or job, and that UNB was at financial and/or regulatory risk if Defendant was not successful in getting the Bluejay loan approved.  But those are reasonable inferences a jury could draw from the evidence that was proven beyond a reasonable doubt.  The jury heard evidence that Defendant's loan portfolio was comprised of millions of dollars in failing loans to Big D, Freeman, Duncan, Skepnek, Fagan,

and related entities.  The jury heard evidence that UNB was a small, one-location bank in

Lawrence.  The jury heard evidence that UNB had to participate out the Bluejay loan, with UNB

carrying only $250,000 of the $15.2 million loan amount.  The jury heard substantial evidence of

Defendant's orchestration of UNB loans, nominee loans, mortgage transfers and assumptions,

loans to pay down debt before the Bluejay loan was approved, loans to purchase collateral and

pay off liens, and a "charade" of a lumber inspection using a phony invoice and a false lumber

letter that Defendant directed Fagan to write for Duncan's signature.  The jury heard from

Rhonda Scott how unusual it was for Defendant to be this directive and active in the loan

process.  They heard from Fagan, Oehlert, Duncan and Larkin how directive and active

Defendant was in orchestrating transactions that covered their true financial condition ahead of

the loan approval, orchestrating the myriad of undisclosed loans made before the Bluejay loan

closed, and orchestrating the important sequence of transactions upon the closing of the Bluejay

loan, to cover these same undisclosed transactions.  Furthermore, the jury heard from Scott that

while OCC was conducting an examination of UNB in 2008, Defendant directed her to remove

one to two dozen files from Freeman's customer profile, a highly unusual and suspect request.

From all of this a reasonable jury could draw the exact inferences of motive argued by the

government.

        In short, the government's closing argument was firmly rooted in the evidence, made fair

use of a hypothetical to draw a contrast between Defendant's actual representations and what

truthful and full disclosure would have comprised, and drew reasonable inferences from the facts

established by the evidence.  The Court thus finds that Defendant has not shown any basis for it

to grant a new trial.  That aspect of his motion is denied.

        **D.**        **Professional Chaos Surrounding Judge Carlos Murguia**

Finally, Defendant argues that "the professional chaos surrounding" the trial judge, Carlos Murguia, warrants a new trial. In August 2018 Chief Judge Timothy Tymkovich of the United States Tenth Circuit Court of Appeals identified a complaint of judicial misconduct against Judge Carlos Murguia. On August 10, 2018 Judge Murguia filed a Notice[106] rescheduling the motions hearing in this case from September 5, 2018 to October 10, 2018.[107] On September 19, 2018 Judge Murguia filed an Order[108] cancelling the October 10 motions hearing, removing the case from the November 5, 2018 trial calendar and directing the parties to jointly propose two alternative trial dates to commence after March 18, 2019.

In the September 19, 2018 Order, Judge Murguia explained that "[t]he court is unable to conduct this trial beginning on November 5, 2018. During the three-to-four week period anticipated for trial, there would be a number of unavoidable disruptions for prior-scheduled court business, criminal hearings implicating speedy trial rights, and public holidays (including both Veterans Day and Thanksgiving Day). The court cannot conduct trial every day and does not expect to complete the trial before the end of November." Judge Murguia went on to explain that another criminal case, *United States v. Mader*, had been set for trial in November since February 2018, that this was the first trial setting in this case, but the third trial setting in *United States v. Mader*, and that the *Mader* case had been pending 18 months longer than this case.[109]

---

[106] Doc. 38.

[107] On the same date a Minute Order Reassigning Case to Judge Daniel Crabtree (Doc. 42) was filed; the following day a Minute Order Reassigning Case back to Judge Murguia (Doc. 43). There is no explanation in the record as to these reassignments.

[108] Doc. 48.

[109] *Id.*

On November 14, 2018, Judge Murguia entered an Order[110] scheduling the jury trial for August 5, 2019.  In this Order, Judge Murguia found that the government had on October 24 submitted proposed trial dates; and on October 25 Defendant had submitted proposed trial dates. After taking those dates into consideration, as well as the parties' revised estimates that trial would last 17 days, Judge Murguia scheduled the trial for August 5, 2019.  On August 5, 2019 Judge Murguia conducted a pretrial conference and issued rulings on motions in limine;[111]and trial commenced on August 6, 2019.[112]

After the trial adjourned, on September 30, 2019, the Judicial Council of the Tenth Circuit Court of Appeals issued an Order[113] publicly reprimanding Judge Murguia, finding that he  had committed judicial misconduct by sexually harassing Judiciary employees, by engaging in an extramarital sexual relationship with an individual then on probation for felony convictions in state court, and by demonstrating habitual tardiness for court engagements.

Defendant now moves for a new trial on the basis that "[i]t is impossible to believe that the professional chaos surrounding this Court at the time of the Complaint and thereafter did not impact this case."[114]  But Defendant points to nothing that affected, much less prejudiced his case.  Instead, despite Judge Murguia's well-articulated reasons for continuing the trial, Defendant engages in rank speculation that Judge Murguia's continuance of the motions hearing and trial date was related to the then ongoing investigation into his misconduct.  Defendant further argues that he has concerns with Judge Murguia's impartiality, bias and temperament, but

---

[110] Doc. 60.

[111] Doc. 110.

[112] Doc. 113.

[113] Doc. 150-2 (*In re Complaint Under the Judicial Conduct and Disability Act,* No. 10-18-90022 (10th Cir. Jud. Council Sept. 30, 2019)).

[114] Doc. 150, at 55–58.

points to nothing specific that actually or potentially prejudiced his case.  And to the extent Defendant speculates that the misconduct investigation impaired Judge Murguia's analysis and to the extent Defendant argues that Judge Murguia should have recused from the case, those arguments are rendered moot.  This case was reassigned to the undersigned judge on February 20, 2020 and the undersigned judge has reviewed Judge Murguia's analysis and rulings in the context of the specific grounds Defendant raises for acquittal or new trial.

The Court thus finds that Defendant has not shown any basis for it to grant a new trial. That aspect of his motion is denied.

## III.  Conclusion

Viewing the evidence in the light most favorable to the government, a reasonable jury could find that the evidence proved beyond a reasonable doubt that Defendant committed the crimes charged in Counts 2–7 of the Indictment.  Further, Defendant has established no basis for a new trial because the court properly admitted the Rule 1006 summaries and properly excluded the Chalmers memorandum; the government's closing argument was rooted in the evidence and reasonable inferences that could be drawn from the evidence such that the closing argument did not constitute prosecutorial misconduct nor warrant a new trial; and Defendant points to no prejudicial effect nor any other reason warranting a new trial arising from the unrelated investigation into judicial misconduct of Judge Murguia.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Acquittal and for New Trial (Doc. 123) is denied.

**IT IS SO ORDERED.**

Dated: May 11, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE